[No. H025873. Sixth Dist. Oct. 1, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
DAO VAN VY, Defendant and Appellant.

## [CERTIFIED FOR PARTIAL PUBLICATION[*]]

---

[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through VIII, inclusive.

## COUNSEL

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and John R. Vance, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WALSH, J.**—Defendant Dao Van Vy (age 16) was a member of a small Vietnamese gang in San Jose. He and five other young males attacked a single unarmed male in a parking lot in broad daylight after the victim claimed membership in a rival gang. Defendant—who was the only armed assailant and the only one hiding his identity by pulling a stocking over his face—stabbed the victim with a knife several times in the chest and stomach. The victim suffered massive injuries but survived due to extraordinary medical intervention.

Defendant was convicted of attempted murder (Pen. Code, §§ 664, subd. (a), 187, 189) for his lead role in the brutal attack (count 1).[1] The jury also found true two enhancements: (1) the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); and (2) defendant's attempt to murder the victim was willful, deliberate, and premeditated (§§ 189, 664, subd. (a)). Defendant was also convicted of assault (§ 240) in connection with a later attack on another Vietnamese youth that occurred in Juvenile Hall (count 2).

Defendant appeals, challenging the conviction as to count 1 only. In the published portion of the opinion, we address defendant's two claims of error concerning the gang enhancement. On the first issue, we conclude that three violent assaults by defendant's gang (including the attack on the victim) over less than a three-month period constituted sufficient evidence that the commission of such predicate crimes was one of the "primary activities" of defendant's gang. (§ 186.22, subd. (f); hereafter section 186.22(f).) Second, we find that the trial court did not commit instructional error by including attempted murder as a predicate crime that the jury could consider for the "primary activities" prong of the gang enhancement. In the unpublished portion of the opinion, we address defendant's claims of various instructional error, abuse of discretion by the court in its denial of defendant's motion

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

under section 1385 to strike the willful, deliberate, and premeditated enhancement, and error in ordering defendant to pay $5,000 in attorney fees under section 987.8.

We reject defendant's challenges on appeal, save for the order of attorney fees. Except for striking the attorney fees order, we therefore affirm the judgment.

## FACTS

■ We present a summary of the evidence from the trial utilizing the applicable standard; we resolve factual conflicts in support of the verdict. (*People v. Holt* (1997) 15 Cal.4th 619, 667–668 [63 Cal.Rptr.2d 782, 937 P.2d 213].) In addition, since none of the challenges on appeal concerns the assault conviction (count 2),[2] our summary includes only the evidence pertaining to the attempted murder conviction (count 1).

### I. *Introduction*

The prosecution asserted that the May 27, 2000 stabbing of the victim, Kiet Nguyen, charged in count 1, arose out of a conflict between two Vietnamese street gangs. In an aid to understanding the evidence, we identify briefly the relevant gangs and their participants:

Young Asians: Gang members included defendant, Tai N., Tu N., and Kim V. Friends of the gang included Lili H. (Kim's girlfriend), Andy N., and Thai P. (Andy N.'s ex-girlfriend).

Kings of the Night: Gang members included Kiet Nguyen (the victim), Huy L., and Dien L. Friends of the gang included Thai P. (Huy's girlfriend).

Viet Killers: Rival gang of Young Asians, and a gang friendly with Kings of the Night.

### II. *Prosecution Witnesses*

#### A. *Kiet Nguyen*

Kiet Nguyen was 20 years old at the time of the attack. Until shortly before the incident, he was a member of the Vietnamese gang Kings of the Night

---

[2] Defendant was charged with assault with a deadly weapon (§ 245, subd. (a)(1)) in connection with a February 16, 2001 incident at Juvenile Hall involving Nguyen N. Defendant attacked the victim in a common eating area, striking him repeatedly in the back with both fists clenched. Shortly after the two youths were separated, a counselor found a sharpened object (toothbrush) close to the scene of the attack. The victim was not seriously injured.

(KON), which he cofounded in 1998. He had a "KON" tattoo on his arm to indicate his affiliation with the KON gang. Between 1998 and 2000, Kiet was involved with KON in fights with rival gangs, where KON was sometimes the aggressor and where weapons were sometimes used.

Kiet first became aware of the Young Asians (YA) Vietnamese gang in 1998, and he knew that defendant was one of its members. When Kiet first met defendant in 1998, there were no problems between KON and YA. About one year before the May 2000 attack, KON confronted YA near a high school; KON "checked" YA (i.e., challenged YA to a fight), and YA backed down. The YA members involved in this incident were defendant, Tai N., and one other person.

Kiet was also familiar with the Viet Killers (VK) gang. In 1999 and early 2000, KON and VK were "clicking" (were friendly and hung out together). Kiet testified that if a gang that was a rival of KON "clicked" with a third gang, KON would perceive the third gang to be its rival as well.

There were problems between YA and VK approximately one month before the May 2000 stabbing incident. There was also a confrontation between KON and YA at a coffee shop about two weeks before Kiet was stabbed.

In the early afternoon of May 27, 2000, Kiet went to the Dao Hong coffee shop in San Jose with his friend and former KON member, Huy L. They were accompanied by Thai P. (Huy's girlfriend), and Lili H. Their group sat at one table in the cafe.

After about 10 minutes, Kiet noticed Tai N., Tu N., and two other young males at another table. Kiet noticed that the males from the group were staring at him.

About five minutes later, Kiet's friends left, and Kiet remained at the table by himself. The males, including Tai and Tu, continued to stare at Kiet continuously, which caused Kiet concern. At some point within a half-hour of Kiet's arrival, the other group left the cafe.

Lili approached Kiet and told him that someone outside wanted to talk to him; she then said, "[D]on't come out." When Kiet went outside the cafe, he saw a group of six or seven young (17 to 18 years old) Vietnamese males, including Tai and Tu. Kiet walked over to the group and asked (in Vietnamese) what they wanted. Someone then asked Kiet, "[A]re you Kiet, KON?" Kiet responded, "[Y]es, I am. . . . [W]hat do you guys want?" The group then "jumped" him. Kiet was punched by more than one person in the area

between his face and stomach. He tried to block the punches by raising his hands to his face with his arms perpendicular to his body and his elbows together.

At the beginning of the attack, Kiet saw defendant behind the group pulling a stocking over his face. (Defendant was the only one of the attackers who concealed his identity.) Kiet testified that when he saw defendant pull the stocking over his face, "I knew I was gone. [¶] . . . [¶] Because I knew he [was] going to kill me." He saw a "shiny object," which he believed was metal, "pull[ed] out from [defendant's] pocket or something, just to the right of . . . where his waist [was]." Kiet observed defendant lunging toward him but did not actually see defendant hit him. He did not feel himself being stabbed at the time; he realized he had been stabbed when "[he] looked down and saw [his] guts falling out."

Kiet remained standing during the entire attack, which lasted approximately one minute. The attack ended when Kiet began running toward the entrance to the coffee shop. He had placed his hands over his stomach because of his injuries. Kiet was cognizant by this time of the severity of his wounds; he testified, "I knew I was dead." His attackers did not chase him; they were running in the opposite direction when Kiet last saw them. Kiet ran into the cafe, where he saw a friend, Hoang L., who asked Kiet who had attacked him. Kiet responded that "YA stabbed me."

Kiet was taken to the hospital, where he remained for an extended time (two weeks to one month). The police (Detective Jason Ta and Detective Shawny Williams) interviewed him in the hospital.

### B. *Tai N.*

Tai N. was 16 years old at the time of the May 27, 2000 stabbing incident. Tai—like defendant—was originally charged with the attempted murder of Kiet, along with allegations that it was done willfully, deliberately, and with premeditation, and that it was done for the benefit of a criminal street gang.[3]

Tai belonged to YA and had a "YA" tattoo on his right arm. YA was started in 1998, and had five members (who had gone to school together)—Tai, defendant, Tu, Kim V., and Khoi. The other YA gang members had similar tattoos. Andy N. was not YA, although YA members were his friends. The YA members did not spend all of their time getting into fights. They also "hung out" and did "stuff that 16-year-olds do."

---

[3] Tai pleaded guilty to a charge of felony assault in connection with the stabbing. As part of his plea agreement, Tai agreed to testify in the trial against defendant fully and truthfully.

YA had a problem with a rival gang, VK, that arose out of a fight on March 4, 2000, at a birthday party for Lili in which Tu stabbed a VK member. After this stabbing, there were problems between YA and KON because KON "backed up" VK in fighting, and members of VK and KON hung out together. As a result, YA also considered KON to be a rival gang.

On May 27, 2000, Tai met defendant, Tu, and Andy at the Dao Hong coffee shop. Tai and his friends sat at one table. Lili arrived at the cafe with Kiet, Huy, and Thai. Tai knew Kiet and Huy, and associated them with KON. Defendant was upset that Kiet and Huy had arrived with Lili, and defendant was staring angrily at Kiet and Huy.

Defendant went outside the coffee shop, and Tai followed him. Defendant told Tai that he was "pissed off" at Kiet and didn't like him. Defendant told Tai that he wanted to "jump" Kiet; while outside, defendant called for "backup" to assist him. He also told Tai that he planned to stab Kiet. Defendant showed Tai a silver pocket knife with a three-inch blade that he was carrying.

Defendant, Tai, Tu, and Andy waited outside the coffee shop. They made a plan to "jump" Kiet over a period of five to ten minutes. While they were outside, three or four male friends of defendant (18 to 20 years old) arrived; two of them got out of a car. Defendant, Tai, Tu, and Andy then moved away from the front of the coffee shop to the parking lot to avoid cameras that were at the shop. Tai went into the coffee shop. He asked Lili to pay for coffee—defendant had previously given Lili his wallet—and asked her to ask Kiet to come outside. Defendant had previously asked Tai to make this request to Lili. Tai then returned to his friends outside.

While waiting outside for Kiet, Tai observed defendant putting a sheer lady's stocking on his head (but not over his face), and then covering the stocking with his hat. Kiet came out of the shop and approached the group in the parking lot. Tai asked Kiet (in Vietnamese) if he was KON. Kiet responded that he was KON, and then one of defendant's other friends punched Kiet in the face. Kiet tried to run away but was unsuccessful; Tai and the original attacker continued to punch Kiet. The victim had no weapon, did not punch back, and tried to cover his face.

Tai observed defendant jump into the fight; he believes that he saw defendant strike Kiet. While he was punching Kiet, Tai was nearly stabbed by defendant, who was trying to stab Kiet. After about 10 to 15 seconds, the group ran away, defendant saying, "[L]et's rock, I stabbed a man." Later that day, the group that had attacked Kiet met at a school. Defendant told the group, "[D]amn . . . I can't believe I stabbed that guy."

Tai testified that the reason for the attack was that Kiet was KON, and that "[h]e and VK [were] together." Tai believed that Kiet's gang affiliation was the only reason for the attack.

### C. *Lili H.*

Lili H. was dating Kim V. at the time of the May 27, 2000 incident. Kim had told her that he was a YA gang member. Through Kim, Lili met defendant, Tai, Tu, and Andy, and considered them all her friends.

Lili arrived at the coffee shop on May 27, 2000, with a group that included Thai (her best friend), Kiet, and Huy. She saw defendant, Tai, Tu, and Andy at the cafe, and sat at the table with them. Lili told defendant and Tu not to "mess with" Kiet because he was no longer KON. She did so to try to "[a]void the misunderstanding."

People from defendant's group went in and out of the cafe. Either defendant or Tai asked Lili to approach Kiet to tell him that they wanted to talk to him. She then told Kiet that her friends wanted to talk to him; she also told him that he should *not* go outside. Kiet said he would go outside to talk to her friends "because he was cool with them." Lili tugged on Kiet's pants as he was trying to leave. She did so because she "was scared that something happened [*sic*]."

Within a week after the incident, Lili spoke with defendant over the telephone. Defendant told her that Kiet had claimed KON. Defendant would not tell her who had stabbed Kiet.

### D. *Dr. Richard Kline*

Kiet Nguyen was brought by ambulance to San Jose Hospital. The trauma surgeon who treated Kiet, Dr. Richard Kline, testified that the victim had multiple stab wounds: in the right arm, in the right chest, in the abdomen (two), and in the back. There was also some evisceration. Dr. Kline considered several of the wounds life threatening. He presumed that the chest wound punctured the victim's lung and was potentially life threatening. One of the wounds to the abdomen passed through Kiet's liver and was life threatening. The other abdomen wound struck the mesentery vein,[4] which caused profuse bleeding.

---

[4] The mesentery vein brings blood back from the large bowel to the liver and into the venus system.

Dr. Kline performed emergency surgery on Kiet. Because of massive bleeding, the victim had very low blood pressure, and there were times during the surgery that Dr. Kline thought that the victim would die. Kiet survived, but required three additional surgeries to address complications from the stab wounds.

### E. *Detective Jason Ta*

Detective Jason Ta was the primary investigating officer. He interviewed defendant on May 30, 2000, after advising him of his *Miranda*[5] rights. Defendant at first denied being at the Dao Hong coffee shop on May 27, 2000. He later admitted being at the cafe but denied any involvement in the stabbing. Detective Ta also noted that defendant had a cut right thumb, and that it appeared to be a fresh wound. He also interviewed Tai on several occasions concerning the stabbing. On July 3, 2002, Tai said that he had observed defendant stab Kiet three times.

The trial court qualified Detective Ta as an expert witness in the area of Vietnamese street gangs.[6] He testified that there are approximately 150 to 200 Vietnamese gangs in San Jose. The Vietnamese gangs have as few as three members, do not identify with particular colors, and do not have established territories.

Gang members choose Vietnamese coffee shops, Vietnamese billiards halls, and Vietnamese noodle houses as typical public hangouts. A high percentage (over 90 percent) of violent attacks between rival gang members occur at these three types of establishments. Nearly all of the Vietnamese coffee shops have surveillance cameras inside the premises; gang members thus moved outside at the time of violence in order to avoid having their crimes captured on tape. Detective Ta testified that Vietnamese gang members gain status from violent crimes. Generally, the people who are the leaders are those who "do the craziest thing[s]" or those who "in the minds of the other gang members . . . commit the more severe or serious assaults." Thus, a gang member who murders a rival gang member achieves the highest amount of credibility with his own gang and in the gang culture.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

[6] Detective Ta had been court-qualified as an expert in the area of criminal street gangs in approximately six prior cases. He was born in Vietnam and was fluent in the Vietnamese language. Detective Ta had seven years of experience with the San Jose Police Department. At the time of trial, he was a gang detective, an assignment he had held for three years. Prior to that assignment, Detective Ta had been assigned to a task force of the Federal Bureau of Investigation providing undercover investigative work for Asian organized crime and Vietnamese gang activity. As a gang detective, he spent approximately 90 percent of his time on cases with Vietnamese street gangs (approximately 450 cases, most within the City of San Jose). He had spoken to approximately 500 members of Vietnamese gangs in his investigation of crimes.

Detective Ta was familiar with the Vietnamese gang, YA. It was started in 1998, and as of May 2000, it had approximately six members. YA's rival gangs included Nguio Viet and VK. KON—although not a direct enemy of YA—was a YA rival because of KON's alliance with VK. Detective Ta understood that the YA gang of which defendant was a member was the third generation of YA; the two prior generations of YA were "much more violent" than the third generation.

Detective Ta testified further that he was familiar with the 25 specified felonies under section 186.22, subdivision (e), and that "[a]ssaults, assaults with a deadly weapon," and attempted murder were among those specified crimes that were the primary activities of YA. One instance of YA criminal activity that Detective Ta cited was a stabbing of a VK gang member by a YA member that took place on March 4, 2000, at a birthday party for Lili H.[7] He also cited another instance of YA criminal activity: a May 9, 2000 incident in which a member of a rival gang (Nguio Viet) was stabbed multiple times by YA member Kim V. Kim was adjudicated as having committed an assault with a deadly weapon in that instance.

Gang expert Ta also opined that Kiet's stabbing was done for the benefit of, at the direction of, or in association with a criminal street gang. Detective Ta believed that all three of these alternative requirements were met. He opined further that the crime "was done with the specific intent to promote, further or assist in criminal conduct by gang members."

The stabbing of Kiet was done for the benefit of YA because the crime "was so heinous and it was so violent. It was done in broad daylight in the middle of the day when the coffee shop . . . and the parking lot [were] crowded." The stabbing was at defendant's direction and "was very well planned out"; defendant called for reinforcements, and the attack was committed away from the coffee shop to avoid video surveillance. Detective Ta's conclusion that the crime was gang related was underscored by the fact that Kiet was asked to claim another gang immediately before being attacked. After the person being checked claims membership in a rival gang, the "checker" is then required to resort to violence because "[t]he whole reason for checking somebody is to basically show your dominance over them." This opinion was confirmed by the fact that, after the incident, defendant told Lili that Kiet was stabbed because he claimed KON.

---

[7] Lili H. corroborated Detective Ta's testimony, indicating that Kim, Tai, and Tu were at the party; members of VK showed up at the party; there was a fight; and that one of the VK gang members was stabbed.

### III. *Defense Witnesses*

The defense called three witnesses—KON gang member Dien L., Detective Timothy Ahern, and Detective Shawny Williams. Each witness offered impeachment evidence concerning the victim, Kiet Nguyen. The evidence was to the effect that Kiet and two other KON members had been involved in a December 1999 drive-by shooting of a student, Nick A, a member of the Norteno gang. Kiet was the driver and the supplier of the gun. The student was not injured in the attack. Kiet admitted his role in the attack in an interview in April 2000 with Detective Williams.

## PROCEDURAL BACKGROUND

Defendant was charged with the crime of attempted murder (§§ 664, subd. (a), 187), in connection with the attack on Kiet Nguyen occurring on May 27, 2000. Defendant was also charged with an enhancement that the crime of attempted murder was committed willfully, deliberately, and with premeditation under sections 664, 187, and 189. It was alleged further that defendant committed the crime for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further, and assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).)[8]

Defendant was also charged with the crime of assault with a deadly weapon (§ 245, subd. (a)(1)) in connection with the February 16, 2001 assault upon Nguyen N. at Juvenile Hall. Count 2 included allegations of personal weapon use (§§ 667, 1192.7), and the same gang enhancement alleged in count 1. Upon the People's motion, the court consolidated count 1 with count 2 for trial.

The trial commenced with in limine motions. The jury was empanelled on November 7, 2002. It returned its verdict on December 2, 2002: guilty as charged as to count 1, with true findings as to both special allegations; not guilty of assault with a deadly weapon as charged in count 2, but guilty of the lesser included misdemeanor offense of assault.

Defendant filed a posttrial motion (under § 1385, subd. (c)(1)) to strike the willful, deliberate, and premeditated enhancement for purposes of sentencing under the count 1 conviction. On April 15, 2003, after extensive argument, the court denied the section 1385 motion. At the same time, the court

---

[8] The information charged defendant, Tai, and Tu with the same crime and the same enhancements. As noted in footnote 3, *ante*, Tai entered a guilty plea prior to defendant's trial. The record does not disclose the disposition of the charges against Tu.

imposed a sentence upon defendant of 15 years to life as to count 1 (attempted murder with gang enhancement and willful, deliberate and premeditated enhancement). Defendant was given a concurrent term of six months in county jail for count 2 (misdemeanor assault). The court also ordered that defendant pay $5,000 as reimbursement for attorney fees for his appointed attorney, pursuant to section 987.8, subdivision (b). Defendant filed timely a notice of appeal from the judgment.

## DISCUSSION

### I. *Sufficiency of the Evidence of Gang Enhancement*

#### A. *Contentions on appeal*

Defendant challenges the gang enhancement finding (§ 186.22, subd. (b)(1)) made by the jury. He claims that the evidence was insufficient as a matter of law to establish that YA was a "criminal street gang" because the prosecution did not establish that the commission of one or more predicate crimes was one of YA's "primary activities," as required under section 186.22(f). He argues that there was no evidence that YA engaged in criminal activity that was either "consistent" or "repeated."

The Attorney General responds that, giving proper deference to the judgment, there was sufficient evidence to support the jury's true finding with respect to the gang enhancement. The Attorney General argues that the Legislature did not prescribe a minimum number of predicate crimes that must be committed in order to satisfy the "primary activities" requirement under section 186.22(f). Further, the Attorney General asserts that the predicate crimes relied upon by Detective Ta were assaults with a deadly weapon, which are enumerated crimes under section 186.22, subdivision (e).

#### B. *"Primary Activities" requirement*

The Street Terrorism Enforcement and Prevention Act (STEP Act) was enacted by the Legislature in 1988. (§ 186.20 et seq.) Its express purpose was "to seek the eradication of criminal activity by street gangs." (§ 186.21.) One of the components of the STEP Act is a sentence enhancement provision for crimes committed "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).)

A gang sentence enhancement under section 186.22 must be based upon "substantial evidence . . . support[ing a] finding of the existence of a 'criminal street gang' whose members engage in a 'pattern of criminal gang activity.' [Citations.]" (*In re Jose T.* (1991) 230 Cal.App.3d 1455, 1462 [282

Cal.Rptr. 75].) Section 186.22(f) defines "criminal street gang" for purposes of determining the appropriateness of a gang sentencing enhancement, as follows: "[A]ny ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, of [section 186.22,] subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

■ Therefore, the "criminal street gang" component of a gang enhancement requires proof of three essential elements: (1) that there be an "ongoing" association involving three or more participants, having a "common name or common identifying sign or symbol"; (2) that the group has as one of its "primary activities" the commission of one or more specified crimes; and (3) the group's members either separately or as a group "have engaged in a pattern of criminal gang activity." (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 [59 Cal.Rptr.2d 356, 927 P.2d 713] (*Gardeley*).) Defendant's challenge here concerns only the "primary activities" element of the gang enhancement.

Three years ago, the California Supreme Court was called upon to construe the "primary activities" element of section 186.22(f). In *People v. Sengpadychith* (2001) 26 Cal.4th 316 [109 Cal.Rptr.2d 851, 27 P.3d 739] (*Sengpadychith*), the court explained: "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members. . . . 'Though members of the Los Angeles Police Department may commit an enumerated offense while on duty, the commission of crime is not a *primary activity* of the department. Section 186.22 . . . requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s] . . . . Similarly, environmental activists or any other group engaged in civil disobedience could not be considered a criminal street gang under the statutory definition unless one of the primary activities of the group was the commission of one of the [25] enumerated crimes found within the statute.' " (*Id.* at pp. 323–324, quoting *People v. Gamez* (1991) 235 Cal.App.3d 957, 970–971 [286 Cal.Rptr. 894], disapproved on another ground in *Gardeley*, *supra*, 14 Cal.4th at p. 624, fn. 10.)

The court noted further that "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute."

(*Sengpadychith, supra*, 26 Cal.4th at p. 324.) It held further that the "primary activities" element might also be satisfied by expert testimony of the type found in *Gardeley, supra*, 14 Cal.4th 605, where a police gang expert testified[9] that the defendant's gang "was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. [Citation.]" (*Sengpadychith, supra*, 26 Cal.4th at p. 324.)

"Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities." (*Sengpadychith, supra*, 26 Cal.4th at p. 323.) Such evidence alone, however, is "[n]ot necessarily" sufficient to establish the "primary activities" requirement. (*Ibid.*) Indeed, "evidence sufficient to show only *one* offense [enumerated under section 186.22, subdivision (e)] is not enough." (*In re Jorge G.* (2004) 117 Cal.App.4th 931, 945 [12 Cal.Rptr.3d 193]; see also *People v. Perez* (2004) 118 Cal.App.4th 151 [12 Cal.Rptr.3d 821] [beating six years before subject crime and four shootings less than a week before the subject crime held insufficient to establish predicate crimes were one of "primary activities" of gang].)

Thus, for instance, in one case, the defendants challenged a true finding on a gang enhancement in connection with two robbery counts. (*Duran, supra*, 97 Cal.App.4th 1448.) Defendants claimed, inter alia, that there was insufficient evidence to support this finding because the gang expert's testimony that "the gang's primary activity was 'putting fear into the community,' [described] an activity not listed as one of the statutorily enumerated criminal offenses." (*Id.* at p. 1464.) The court rejected this challenge. (*Id.* at pp. 1465–1466.) It concluded that there was sufficient evidence that one of the gang's "primary activities" was the commission of one or more of the

---

[9] Of course, because the culture and habits of gangs are matters which are "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" (Evid. Code, § 801, subd. (a)), opinion testimony from a gang expert, subject to the limitations applicable to expert testimony generally, is proper. (*Gardeley, supra*, 14 Cal.4th at pp. 617–620.) Such an expert—like other experts—may give opinion testimony that is based upon hearsay, including conversations with gang members as well as with the defendant. (*Sengpadychith, supra*, 26 Cal.4th at p. 324; *Gardeley, supra*, at p. 620.) Such opinions may also be based upon the expert's personal investigation of past crimes by gang members and information about gangs learned from the expert's colleagues or from other law enforcement agencies. (*Sengpadychith, supra*, at p. 324; *Gardeley, supra*, at p. 620.) Expert testimony of such a nature was held sufficient to satisfy the "primary activities" element of section 186.22(f) in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 [119 Cal.Rptr.2d 272] (*Duran*), *People v. Galvan* (1998) 68 Cal.App.4th 1135, 1138 [80 Cal.Rptr.2d 853], and *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370 [37 Cal.Rptr.2d 596]. (See also *People v. Killebrew* (2002) 103 Cal.App.4th 644, 656–657 [126 Cal.Rptr.2d 876] [discussing various gang issues that California courts have recognized as proper subjects for expert testimony].)

statutorily enumerated offenses because the gang expert's "testimony supported a jury finding that members of the [gang] were engaged in more than the occasional sale of narcotics, robbery, or assault. [The gang expert] testified that the [gang] members engaged in these activities 'often,' indeed often enough to obtain 'control' of the narcotics trade in a certain area of Los Angeles. Evidence of the [charged] robbery and [a gang member's prior] conviction [for felony possession of cocaine base for sale] further corroborated [the expert's] testimony, providing specific examples of [gang] members' commission of robbery and narcotics offenses. We conclude the evidence was sufficient to support the jury's true finding on the section 186.22 gang enhancement." (*Ibid.*)

## C. Standard of review

■ In determining whether the evidence is sufficient to support a conviction or an enhancement, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; see also *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) Under this standard, "an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." (*Woodby v. INS* (1966) 385 U.S. 276, 282 [17 L.Ed.2d 362, 87 S.Ct. 483].) Rather, the reviewing court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson, supra*, at p. 578.) This standard applies to a claim of insufficiency of the evidence to support a gang enhancement. (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 484 [67 Cal.Rptr.2d 126].)

## D. Discussion

In following *Sengpadychith, supra*, 26 Cal.4th 316, we review the record to determine whether there was substantial evidence upon which the jury could have concluded that "the commission of one or more of the statutorily enumerated crimes [was] one of [YA's] 'chief' or 'principal' occupations." (*Id.* at p. 323.) The evidence here was that the YA gang had been in existence for a period of approximately two years. No evidence was presented that YA committed any of the 25 predicate crimes enumerated in section 186.22, subdivision (e) in either 1998 or 1999. There were, however, three predicate

crimes—including the attack upon Kiet[10]—that were committed by YA over a short period of time in 2000.

The prosecution identified a felony assault occurring on March 4, 2000 (i.e., stabbing of VK member by a YA member), as one criminal act. Detective Ta—who was highly qualified as an expert on the subject of Vietnamese gangs—testified that YA (Kim) committed another assault with a deadly weapon in May 2000. The third YA criminal act was the attempted murder of Kiet by defendant charged as count 1. While defendant challenges the inclusion of attempted murder as a predicate crime, we disagree.[11] Furthermore, even were defendant's argument to have merit, it would be of no consequence; plainly, the crime committed by Tai N. (felony assault) in the same attack upon the victim, Kiet, is an enumerated offense which can be considered for a "primary activities" element of the gang enhancement statute. (See § 186.22, subd. (e)(1).)

Viewing the evidence "in the light most favorable to the prosecution" (*Jackson v. Virginia, supra,* 443 U.S. at p. 319), we find that it is sufficient to satisfy the "primary activities" prong of section 186.22(f). The evidence here shows the existence of three serious, violent crimes by YA gang members that took place over a period of less than three months. Significantly, two YA stabbings of rival gang members preceded the charged crime by only 12 weeks.

Defendant urges us to look at the entire two-year period of YA's existence in order to conclude that the gang did not "*consistently and repeatedly*" engage in predicate criminal acts. (*Sengpadychith, supra,* 26 Cal.4th at p. 324.) Under the circumstances presented here, however, we reject defendant's invitation to essentially "spread out" the predicate crimes over YA's entire existence. Instead, we find the existence of three violent felonies by a gang as small as YA over less than three months to be sufficient to satisfy the "primary activities" element. Stated otherwise, the fact that YA's level of criminal activity lay dormant for most of its existence does not preclude a finding that it was a gang under the enhancement statute, where there was

---

[10] The Supreme Court in *Sengpadychith* resolved a prior conflict between two appellate districts concerning whether acts committed at the time of the charged offense (including the charged offense itself) may be used to establish the "primary activities" element of the gang enhancement. The court decided that both past crimes *and* "the *present* or charged offense" may be considered "in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes." (*Sengpadychith, supra,* 26 Cal.4th at p. 323.)

[11] This issue is addressed more fully in connection with our review of defendant's challenge to the gang enhancement instruction. (See discussion in part II, *post.*)

evidence of consistent and repeated criminal activity during a short period before the subject crime.[12] Moreover, the fact that there was evidence elicited from Tai during cross-examination by defense counsel that the YA members did "stuff that 16-year-olds do" does not negate other evidence that YA committed crimes sufficient to satisfy the "primary activities" prong of section 186.22(f).[13]

Furthermore, proof of the "primary activities" element was satisfied through testimony by a police gang expert, Detective Ta. He gave significant expert testimony that YA was engaged in criminal actions that constituted predicate crimes under the gang statute. (See *Sengpadychith, supra,* 26 Cal.4th at p. 324.)

██ We therefore conclude that there was sufficient evidence to support the jury's finding that YA—as one of its "primary activities"—engaged in one or more predicate crimes under section 186.22(f), and that YA was thus a "criminal street gang."

## II. *Gang Enhancement Instruction*

The court instructed the jury regarding gang enhancement, utilizing CALJIC No. 17.24.2. Defendant contends that the court erred in its inclusion of attempted murder as a predicate crime for the jury's determination of the "primary activities" prong of the enhancement charge. The Attorney General responds that attempted murder was, indeed, a predicate crime that may properly be considered in determining the "primary activities" element of the

---

[12] Defendant relies upon the recent case, *People v. Perez, supra,* 118 Cal.App.4th 151, in support of his claim that there was insufficient evidence to support a "primary activities" finding under the gang enhancement statute. *Perez* is factually distinguishable and is not controlling. In *Perez,* the defendant was a member of a Latino gang, East Side Longos, consisting of over 300 persons. (*Id.* at p. 157.) There was other evidence that the defendant may have been a member of an affiliated gang, CLB, which had approximately 20 members. (*Ibid.*) Besides the subject shooting of a youth by the defendant, the only predicate crime that the evidence clearly showed was committed by either such gang was an attempted murder of another youth six years earlier. (*Ibid.*) The prosecution cited the shootings of four youths less than one week before the subject crime in support of the "primary activities" prong of the gang enhancement. The evidence that the defendant's gang (or a gang affiliated with the defendant's gang) committed these four shootings, however, was equivocal at best. In contrast, here, the three predicate crimes used to establish the "primary activities" element were indisputably committed by defendant's gang, YA.

[13] The exchange of questions and answers between defense counsel and Tai was as follows: "Q. Did you guys just sometimes just go hang out? [¶] A. Yeah. . . . [¶] Q. Did you spend all of your time going out and getting in fights when you were together? [¶] A. What do you mean? [¶] Q. During the time that you were with Dao and Tu and Andy, did you spend all of your time these two or three years that you knew them always getting in fights? [¶] A. No. [¶] Q. Did you just kind of do stuff that 16-year-olds do? [¶] A. Yeah. [¶] Q. Most of the time were you basically just doing the stuff that 16-year-olds do? [¶] A. Yes."

gang enhancement. We are aware of no reported cases that have expressly held that attempted murder is a predicate crime that may be utilized for the "primary activities" prong of the gang enhancement statute. Several appellate courts, however, have accepted without comment the inclusion of attempted murder as a "primary activities" crime in the particular cases before them. (See, e.g., *People v. Perez, supra,* 118 Cal.App.4th 151; *People v. Galvan, supra,* 68 Cal.App.4th 1135.) We conclude that the instruction was proper.

■ It is clear that, in order to show "a pattern of criminal activity" under subdivision (e) of section 186.22, the fact finder may consider the commission of one of the 25 enumerated offenses *as well as the attempted commission of such crimes.* (§ 186.22, subd. (e).) Thus, the attempted (but unsuccessful) commission of any of the 25 crimes enumerated under subdivision (e) would constitute a predicate crime to show "a pattern of criminal activity" under that subdivision.

Defendant argues, however, that only the *successful commission* of one or more of the 25 enumerated crimes may be utilized to find that the crime or crimes constitute(s) one (or more) of the "primary activities" of a group under section 186.22(f). We disagree. Subdivision (f) refers to the criminal acts enumerated in subdivision (e); the latter subdivision includes "the commission of, attempted commission of, conspiracy to commit, or solicitation of" the 25 enumerated crimes. (§ 186.22, subd. (e).)

If we were to take defendant's argument to its logical extreme, then a group that committed *numerous* crimes of *attempted* murder *could not* qualify as a criminal street gang under the "primary activities" requirement of section 186.22(f), simply because the crimes did not result in the victims' deaths. The fact that the violent gang is one "that couldn't shoot straight"[14] should not of itself exempt it from being a criminal street gang. Given the Legislature's expressed intent to eradicate criminal street gangs,[15] we seriously doubt that the STEP Act was intended to apply only to violent street gangs who are successful in committing their intended crimes, while ignoring similarly violent but unsuccessful gangs.

■ Since section 186.22(f) refers to the crimes enumerated in subdivision (e), it logically follows that the attempted commission of such crimes should

---

[14] See Breslin, The Gang That Couldn't Shoot Straight (1969).

[15] "The Legislature hereby finds and declares that it is the right of every person . . . to be secure and protected from fear, intimidation, and physical harm caused by the activities of violent groups and individuals. . . . [¶] . . . [T]he State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods. . . . It is the intent of the Legislature in enacting this chapter to seek the eradication of criminal activity by street gangs by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs." (§ 186.21.)

satisfy both the "primary activities" requirement under subdivision (f) and the "pattern" requirement under subdivision (e). We therefore conclude that the trial court did not err in giving the challenged instruction.[16]

## III–VIII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order directing defendant to pay $5,000 in attorney fees pursuant to section 987.8 is hereby stricken. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy of the amended abstract to the Department of Corrections. As modified, the judgment is affirmed.

Rushing, P. J., and Premo, J., concurred.

A petition for a rehearing was denied October 25, 2004, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 19, 2005.

---

[16] We acknowledge that there are some anomalies between subdivisions (e) and (f) of section 186.22 with respect to the definition of predicate crimes for determining "pattern of criminal activity" and the "primary activities" element of a criminal street gang, respectively. As noted, however, we do not believe that it was the Legislature's intent to exempt members of street gangs from punishment under the STEP Act simply because their gang was unsuccessful in its felonious criminal activity.

*See footnote, *ante*, page 1209.