Filed 5/20/13  P. v. Ulloa CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JAVIER MANUEL ULLOA,<br><br>　　　Defendant and Appellant. | B242104<br>(Los Angeles County<br>Super. Ct. No.  BA361536) |

　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Rand S. Rubin, Judge.  Affirmed.

　　　Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Mary Sanchez, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Javier Manuel Ulloa contends substantial evidence does not support the jury's true finding that the offenses of which he was convicted -- shooting at an occupied vehicle and assault with a firearm -- were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members within the meaning of Penal Code section 186.22, subdivision (b)(1)(C). Specifically, he contends the prosecution failed to present adequate evidence of the subject gang's primary activities.[1] We conclude otherwise and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Information*

Appellant was charged by information with attempted willful, deliberate, premeditated murder (§ 664/187(a)) (count one), shooting at an occupied vehicle (§ 246) (count three), and assault with a firearm (§ 245, subd. (a)(2)) (count four).[2] It was further alleged that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members within the meaning of section 186.22, subdivision (b)(1)(C). It was also alleged that as to counts one and three, appellant personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm which caused great bodily injury within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1) and that he personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a).

---

[1]     Unless otherwise designated, statutory references are to the Penal Code.

[2]     Count two, for felony evading (Veh. Code, § 2800.2, subd. (a)), was dismissed.

B. *Evidence at Trial*

1. *Evidence of the Offenses[3]*

On August 20, 2009, Laval Adolph was driving on Avalon Boulevard near 79th Street. While waiting at a stoplight, he noticed a gun pointing out the open front window of a car to his right. Adolph took evasive action, accelerating into oncoming traffic, but was shot.[4] Adolph could not identify the driver of the car, but recalled that he was Hispanic, with long hair.[5]

Two police officers who were patrolling nearby heard multiple gunshots and within seconds saw a car speeding away from the area and executing a number of turns. The officers followed the car. When they activated their patrol vehicle's lights and siren, the car accelerated and drove through stop signs and a red light with the officers in pursuit. The suspects' car stopped abruptly and four people got out. The officers got a good look at the driver, a male Hispanic with long hair and a tattoo on his neck. They later identified appellant as the driver. The officers chased and apprehended one of the passengers, Christopher Edwards, who was holding a gun when he exited the car.[6] The suspects' car was impounded and investigating officers found documentation inside it indicating it had recently been purchased by appellant.

---

[3]    Because appellant raises no issues with respect to guilt, we discuss the facts of the offenses only briefly.

[4]    The bullet collapsed Adolph's lung and cracked some of his ribs.

[5]    At the time of the shooting, appellant had long hair. When he was arrested sometime later, he had cut his hair.

[6]    Edwards quickly dropped the gun and the officers recovered it. It was a .40 caliber, the same caliber as casings found in Adolph's car, in the street in the area of the shooting, and in the suspects' car. The casings matched a casing the police criminalist test-fired from the recovered gun.

After first denying any knowledge of the shooting, Edwards told police officers -- and later testified -- that the car was being driven by appellant when Adolph was shot, while Edwards was sitting on the passenger side of the back seat. Edwards, then a member of Florencia 13, had been picked up earlier in the day by appellant and his companions, a female and a male member of Florencia 13 known as "Bullet." Edwards recognized appellant as a senior member of the same gang, who used the nickname "Yogi." Appellant was a "shot-caller," someone who "whatever he says goes." When the car was traveling on Avalon Boulevard, appellant grabbed a gun from the side of his seat and started shooting out the window toward another car. After the shooting, while they were being chased by the police officers, appellant ordered Edwards to take the gun. He did, but dropped it as soon as he got out of the car.

2. *Gang Evidence*

Gang expert, Officer Guillermo De La Riva, had been a police officer for four years. He had grown up in Santa Ana, and was familiar with the Hispanic gangs in that area. He had had 60 hours of training in gang awareness after becoming a police officer. In addition, he had attended conferences and roll calls where senior officers lectured on Hispanic gangs. He also familiarized himself with gangs by reading books written by gang members and talking to senior gang officers from other cities. He had personally interacted with more than 200 Florencia 13 members.

Officer De La Riva testified that Florencia 13 has over 2000 members in Los Angeles County. It is affiliated with the Mexican Mafia, also called "La Eme," the Spanish pronunciation of the letter "M" which is the 13th letter in the alphabet. The affiliation means that Florencia 13 pays "taxes" to the Mexican Mafia and that gang members obtain protection from the Mexican Mafia when in prison.

4

Florencia 13 has a hand sign and members use "F13" and "FX3" to symbolize their membership. Its rivals include the East Coast Crips and 18th Street, both African-American gangs. There were three cliques of Florencia 13 in Officer De La Riva's division: the Neighborhoods, the Locos, and the West Side Florencias.

From conversations with Florencia 13 gang members and fellow officers, Officer De La Riva learned that appellant was a member of the gang and had heard no information from any source that appellant had ever left the gang.[7] Appellant's tattoos indicated he was from Florencia 13's Gangster clique, which operates out of Huntington Park.[8]

Officer De La Riva testified that gang members "put in work," which in gang culture means committing crimes to benefit the gang, such as attempted murder, shootings, robberies, and "tagging" to mark the gang's claimed territory. Other gang members look up to those who "put in work" by committing crimes. The prosecutor asked what type of crimes Florencia 13 gang members were known to commit. Officer De La Riva responded: "They're known to commit murder, shootings, both walk-ups and drive-bys, robberies, assaults, stabbings, burglaries . . . ." The prosecutor went on to ask specifically whether Florencia 13 members commit "minor acts of vandalism," "attempted murders, "narcotics possession," and "narcotics sales," and Officer De La Riva responded in the affirmative. On

---

[7] Two other officers testified they had interviewed appellant several times beginning in 2005 and that appellant consistently admitted being a member of Florencia 13.

[8] Appellant, while testifying on his own behalf to deny committing the crime or being in the car, acknowledged that his tattoos indicated membership in the Florencia 13 Gangster clique.

cross-examination, Officer De La Riva testified that lower ranked members or "wannabe'[s]" could elevate their status by committing drive-by shootings.[9]

The prosecutor formed a hypothetical based on the evidence presented in the prosecution's case and asked Officer De La Riva for his opinion whether such a shooting was committed for the benefit of the gang. Officer De La Riva testified that even though the shooter did not shout out the gang's name, people in the neighborhood would learn what happened, and word would spread that it was committed by the gang. This would enhance the gang's status and cause members of the community to fear it and fear retaliation if they reported crimes its members committed. The fact that the shooting was apparently unplanned and the victim was randomly selected would elevate the status of the shooter for ruthlessness and cold-bloodedness. If the shooter was a member of a clique that operated outside the area of the shooting, it would build up his status and reputation in the cliques operating in the area where the crime was committed.

Officer De La Riva also testified that a low ranking gang member could be "green lighted" if he did not obey a directive from a more senior member to help conceal a crime, and that a snitch would also be "green lighted," which meant that he or she could be murdered or assaulted.

C. *Verdict and Sentencing*

The jury found appellant not guilty of attempted murder (count one) and guilty of shooting at an occupied vehicle and assault with a firearm (counts three

---

[9]     Officer De La Riva also testified he was familiar with Florencia 13 gang members Hugo Pineda and Efren Ruiz, who were members of the gang on dates when they participated in the shootings of an off-duty African-American police officer and another African-American male. Officer De La Riva gained his familiarity with these crimes by speaking with the investigating officers.

and four). The jury found true all the firearm enhancements, the infliction of great bodily injury enhancement and the gang enhancement. Appellant admitted three priors. The court sentenced him to a 20-year determinate sentence, consisting of seven years for count three, plus ten years for the gang enhancement and three years for the three priors. The court also imposed a consecutive 25-year to life indeterminate sentence under section 12022.53, subdivision (d).[10]

## DISCUSSION

Section 186.22, subdivision (b)(1)(C), the gang allegation charged against appellant, imposes additional punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." "Criminal street gang" is defined as "'any ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more' criminal acts enumerated in subdivision (e) of the statute, and which has 'a common name or common identifying sign or symbol, [and] whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 616, quoting § 186.22, subd. (f), italics deleted, fn. omitted.) Appellant contends the jury's true finding with respect to the gang enhancement was unsupported because the prosecution presented insufficient evidence that one of Florencia 13's primary activities was

---

[10] Sentence on count four was imposed and stayed pursuant to section 654.

7

the commission of criminal acts enumerated in subdivision (e) of section 186.22.[11] For the reasons stated, we disagree.

"'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

As explained in *People v. Sengpadychith* (2001) 26 Cal.4th 316, "[t]he phrase 'primary activities[]' . . . implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations," and serves to exclude from the definition of "gang" social and political groups whose members occasionally violate the law, such as an environmental group whose members periodically engage in civil disobedience. (*Id.* at pp. 323-324.) The court made clear that sufficient proof that a gang's

---

[11] Among the crimes enumerated in subdivision (e) of section 186.22 are assault with a deadly weapon or force likely to produce great bodily injury, robbery, homicide, sale of narcotics, shooting at an occupied motor vehicle, discharging a firearm from a motor vehicle, burglary, felony vandalism, and illegal weapons possession. (§ 186.22, subds. (e)(1)-(6), (e)(11), (e)(20), (e)(23), (e)(31)-(33).) The attempted commission of such crimes can also serve to support the enhancement. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1226-1227.)

primary activities included commission of the necessary criminal offenses could be derived from "evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute." (*Id*. at p. 324, italics omitted.) It further noted that "'either prior conduct or acts committed at the time of the charged offenses can be used to establish the "primary activities" element of the gang enhancement.'" (*Id*. at p. 323; accord, *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 ["Past offenses, as well as the circumstances of the charged crime, have some tendency in reason to prove the group's primary activities, and thus both may be considered by the jury on the issue of the group's primary activities. [Citation.]"].)

Substantial evidence established that a primary activity of Florencia 13 was the commission of criminal offenses specified in section 186.22, subdivision (e). Officer De La Riva testified that members were known to commit murder, attempted murder, robberies, assaults, burglaries, vandalism, and narcotics sales, all of which are enumerated offenses. Although he did not expressly state that these were its primary activities, his testimony with respect to "putting in work" made that clear. He stated that Florencia 13 members committed crimes to benefit the gang, and that gang members look up to those who "put in work" by committing crimes such as attempted murder, shootings, and robbery. When he discussed the benefits to the gang from the instant shooting, he stated that such shootings elevate the gang's status and "allow[] them to do crimes in [their claimed] area without having law enforcement be involved." He also testified in response to defense counsel's questioning that lower ranked members of Florencia 13 could elevate their status by committing a violent crime such as a drive-by shooting. In addition, he stated that Florencia 13 was affiliated with the Mexican Mafia, which assisted its members when they were imprisoned. He further explained that Florencia 13's rivals tended to be African-American gangs and

9

described two instances when gang members had shot African-American men. Viewed as a whole, the evidence supported a reasonable conclusion that Florencia 13 existed for the primary purpose of engaging in criminal conduct of the type specified in the statute and protecting its members from the consequences of such criminal activity.

Appellant's reliance on *In re Alexander L.* (2007) 149 Cal.App.4th 605 is misplaced. There, the prosecution's gang expert testified that the subject gang "'committed quite a few assaults with a deadly weapon, several assaults,'" and had been "'involved in murders'" and "'auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at p. 611.) The appellate court found the testimony insufficient to establish the gang enhancement, both because the expert acknowledged on cross-examination that the "vast majority" of cases connected to the gang were "graffiti related," and because his testimony lacked an adequate foundation: "[i]t is impossible to tell whether his claimed knowledge of the gang's activities [was] based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Id.* at p. 612.)

Unlike the expert in *Alexander L.*, Officer De La Riva provided sufficient background information concerning his training and the sources of his information about Florencia 13 to support the reliability of his opinions and conclusions. The officer testified that he received specific training on gangs, attended lectures by senior officers, had contact with over 200 Florencia 13 members, read books written by gang members, and talked to senior gang officers from other cities, as well as officers involved in investigating the predicate crimes committed by Florencia 13 members. This was sufficient to establish the foundation for his

testimony concerning the gang's criminal activities.[12] (See *People v. Duran, supra,* 97 Cal.App.4th at p. 1465 ["The testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities."]; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 [officer's eight years dealing with subject gang, including investigations and personal conversations with members and reviews of reports, sufficed to establish foundation for his testimony].) In short, substantial evidence supported the jury's finding on the gang enhancement.

---

[12] Appellant contends that Officer De La Riva's testimony lacked foundation and was based on hearsay because he did not specifically state how he knew that the crimes he listed were committed by Florencia 13 members. As we have said, Officer De La Riva explained in his testimony how he came to acquire his knowledge of the gang. To the extent appellant believes the officer was required to specify the source of the information concerning the gang's criminal activities, we note that his counsel did not object to any of the prosecutor's questions on the ground that the testimony lacked foundation. He has therefore forfeited the issue on appeal. (See *People v. Seaton* (2001) 26 Cal.4th 598, 642-643.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


SUZUKAWA, J.

12