Filed 3/11/14  P. v. Piggee CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B245869 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA383909) |
| v. | |
| JAMES EVANS PIGGEE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted defendant and appellant James Evans Piggee in count 1 of second degree murder (Pen. Code, § 187, subd. (a)),[1] willful, deliberate, and premeditated attempted murder in count 2 (§§ 664/187), shooting at an occupied vehicle in count 5 (§ 246), and unlawful firearm activity in count 6 (§ 12021, subd. (e)).[2] As to counts 1, 2, and 5, the jury also found the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(c)) and defendant personally used a firearm (§ 12022.53, subds. (b), (c) [as to counts 1 and 2 only], (d) [as to counts 1, 2, and 5]). Defendant admitted suffering a prior conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). The trial court sentenced defendant to a total of 169 years to life in state prison.

In this timely appeal, defendant argues the judgment should be reversed for the following reasons: (1) the trial court erroneously allowed the prosecution's gang expert to opine that the driver of the vehicle used in the shooting was likely a member of defendant's gang; (2) the trial court committed prejudicial error in denying requested instructions on voluntary manslaughter and attempted voluntary manslaughter based on imperfect self-defense; (3) it was also prejudicial error to refuse to instruct on justifiable self-defense; and (4) the evidence is insufficient to support the findings that the offenses were committed for the benefit of a street gang under section 186.22. We affirm.

**FACTS**

On the morning of April 19, 2011, Daniel Orona picked up Rudy Nava from his home in Orona's gray Astro van. With Orona in the van were his two cousins, Rogelio Gandara (Rocky) and Charles Thompson (Chucky). The four men, all members or associates of the El Sereno gang, drove to California Herbal Remedies, a marijuana dispensary located in a strip mall at 5470 Valley Boulevard, an area claimed by the

---

[1] All statutory references are to the Penal Code, unless otherwise stated.

[2] The jury was unable to reach verdicts on counts 3 and 4.

Metro 13 gang. Nava exited the van when they arrived at the strip mall and began to walk toward the dispensary to purchase marijuana.

Nava saw a man with a pistol get out of a parked white car. Nava continued walking without saying anything. He heard yelling and looked back at the van, where Orona and Gandara seemed to be looking at the car radio. Gandara was talking with Orona and Thompson in the van when Gandara noticed a scared expression on Orona's face. Gandara ducked and closed his eyes. The van suddenly backed up and hit something. Gandara got out of the van and ran to nearby apartments where he called his aunt to pick him up. No one in the van ever pointed a gun at anyone, nor did they say anything to anyone outside the van.

Nava tried to run into the dispensary when he saw the man with the pistol, but the automatic door closed and he was unable to gain entry. Nava ran back toward the van, hearing gunshots. He tried to jump into the van through the side door but was knocked to the ground when the van unexpectedly went into reverse. Nava was eventually able to get into the van when it came to a stop after colliding with something. Thompson was still inside with Orona, who had been shot, but Gandara was gone. Orona drove a short distance until Nava took over and drove him to the hospital, where Orona died from multiple gunshot wounds.

Anthony Brown was a safety officer at the marijuana dispensary, which was equipped with surveillance cameras that covered inside and outside the clinic, four of which were displayed on a monitor. Brown heard gunshots from outside the dispensary at around 12:30 p.m. He watched defendant, a Black male, shooting at the van. Brown observed the van go into reverse and stop, while shots continued to be fired. Defendant ran back to a white car in front of the clinic. As the van drove past the white car, Brown saw defendant get out of the white car and fire additional shots at the van. Defendant entered the white car from the front passenger side door. The driver was a male Latino. When the white car started to leave the area, Brown opened the dispensary door with the idea of taking down the license plate number, but Brown returned inside the dispensary when defendant exited the car and came toward him. At that point, defendant reentered

the white car, which left the parking lot. Brown identified defendant as the shooter from a six-person photographic lineup, and in court at trial.

A second store in the area—Valley Foods Liquor at 5474 Valley Boulevard—also had surveillance cameras covering the inside and outside of the store on the day of the shooting. Sam Hamad, who worked at the store, knew defendant, who visited the store weekly and identified himself as Shady. Other Metro 13 gang members from the neighborhood also frequented the store. Hamad was aware defendant is the only Black member of the otherwise Hispanic gang. Hamad heard gunshots in the parking lot around 12:25 p.m. From a video monitor, Hamad saw a van back up into a pole. He heard six or seven more gunshots. Hamad saw defendant on the video monitor. Defendant was wearing the same clothes he had on when he came into the store earlier that day. He also identified defendant on the video captured from the marijuana dispensary and in a six-pack photographic lineup.

Police officers responded to the hospital where Orona had been taken. They detained Nava and Thompson and took custody of Orona's van. They recovered no weapons from Thompson, Gandara, and Nava, or from the van. It appeared the van had been struck with bullets 11 times, 9 times on the driver's side.

Defendant was detained at his home by police officers on April 27, 2011. The clothing he wore at the time of the shooting, as depicted in the videos, was recovered from his bedroom. Defendant had a Metro PCS cell phone account. Calls were made from defendant's phone number using a cell tower located just north of Valley Boulevard between 12:15 p.m. and 12:24 p.m. on the day of the shooting.

Officer Sergio Leyva testified as the People's gang expert.[3] The Metro 13 gang has been in existence since the 1960s, with 49 documented members who are mostly Hispanic. Defendant is the only Black member of the gang. Orona, Gandara, Nava, and Thompson were members of the rival El Sereno gang (although Gandara denied this in

---

[3] He testified as to the required predicate offenses by Metro 13 gang members, an issue not in dispute on appeal.

his trial testimony).  Officer Leyva expressed the opinion defendant committed his crimes to benefit, and in association with, the Metro 13 gang, and that the crimes promoted the gang.  The gang benefited because violent crime instills fear in rival gang members and the community, discouraging citizens from contacting the police or testifying against gang members.  This type of violence establishes that the gang will retaliate against rival gang members who enter their territory.  The shooting was "in association with" the gang because there was more than one person involved, and that person was more than likely an associate of the gang.  Defendant gained respect within the gang by killing Orona and protecting the gang's territory.

Defendant is the only known Metro 13 member with the moniker of Shady.  There is a "MySpace" account with a vanity URL of "Shady Metro x3" and an associated email account of "Shady_Metrox3@yahoo.com.  The headline in the user profile reads: "Shady Loco T3, Metro 13 Gang, 187 on Cerotes and Trash."  "Serrote" is a Spanish derogatory term for excrement, used by Metro 13 members in reference to El Sereno gang members.  The "MySpace" account had uploaded photos depicting defendant and other Metro 13 gang members displaying gang signs with their hands in photos entitled "Me and the Homies" and "The Home Buzzard, Moreno and Me."  Defendant was convicted of a felony prior to April 19, 2011.

## DISCUSSION

### I

Officer Leyva testified, over defense objection, that the driver of the white car was likely a Metro 13 gang member.  Defendant contends admission of this testimony was error because there is no evidence the driver was a member of defendant's gang.  He argues the error was prejudicial because the officer's opinion tended to improperly establish that defendant committed the offenses *in association* with a criminal street gang, which implicated his right to a fair trial under the federal constitution.  We need not

5

discuss the merits of the contention,[4] as the evidence overwhelmingly establishes that defendant's offenses were committed for the benefit of a criminal street gang, which is a separate and independent basis for the gang enhancement, and the purported error was therefore harmless under any standard of review.

"Section 186.22 adds various sentencing enhancements for gang-related felonies. For purposes of the enhancements, subdivision (b)(1) of that section requires that the felony be committed 'for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' This portion of section 186.22 requires proof of only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, *or* in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members. (*People v. Albillar* (2010) 51 Cal.4th 47, 67 [(*Albillar*)].)" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613.)

Officer Leyva's testimony the driver of the white car was likely a member of defendant's gang would arguably tend to prove one basis for the enhancement under section 186.22, subdivision (b)—that defendant's crimes were committed *in association* with a criminal street gang. But here, there is overwhelming and uncontroverted evidence that defendant's offenses were *for the benefit of* a criminal street gang, a separate and independent basis for liability under the gang enhancement statute. The testimony defendant finds objectionable had no bearing on whether his offenses were committed for the benefit of a criminal street gang.

---

[4] We further note this one isolated piece of testimony played a trivial role in the trial. The testimony was not even mentioned in argument to the jury. Moreover, the jury was instructed at the time the answer was received, and again at the conclusion of the trial, the officer's opinion is only as good as the facts on which it is based, and the jury was free to disregard any opinion based on facts not supported by the evidence. (See Judicial Council of Cal. Crim. Jury Instns. (2011-2012) CALCRIM No. 332.)

Gang rivalry is the only apparent reason for defendant's violent conduct. The Metro 13 and El Sereno gangs were engaged in a violent feud spanning several years. The El Sereno gang members entered territory claimed by Metro 13 and were the subject of an immediate violent attack by defendant, who is unquestionably a hardcore gang member. As explained by Officer Leyva, protection of territory is a gang imperative, and the presence of rival gang members is viewed as a challenge. Defendant's crime benefited Metro 13 by instilling fear in the community and in the rival gang members. The shooting promotes the notoriety of the gang, and it serves as a warning of the dire consequences to a rival gang entering territory claimed by Metro 13 territory. Citizens will be less likely to call the police, testify, or identify gang members due to the intimidation flowing from the gang's violent acts. A gang member who shoots a rival who enters the gang's territory benefits the gang because "he's doing his job. . . ."

The issue of whether the shootings were for the benefit of a criminal street gang was not disputed at trial. Defense counsel never questioned the shootings were gang related. To the contrary, counsel's only argument to the jury admitted defendant was the shooter and he was a gang member, but the crime was something less than the charged offenses because of defendant's knowledge of the ongoing rivalry between the gangs, which caused him to act as he did when he came upon rival gang members in Metro 13 territory. Even the defense version of events acknowledged defendant acted for the benefit of his gang when he saw the El Sereno gang members. Any error in admitting Officer Leyva's opinion that the driver of the white car was likely a gang member was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## II

In separate arguments, defendant contends the trial court committed prejudicial error by refusing to instruct on imperfect self-defense and traditional self-defense. We

treat the issues as one, because both theories suffer from the same evidentiary deficiency. The instructions were properly denied.

Imperfect self-defense exists when a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury; the killing is an offense no greater than voluntary manslaughter. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*); *In re Christian S.* (1994) 7 Cal.4th 768, 771.) Thus, imperfect self-defense describes one type of voluntary manslaughter, and the "trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter. [Citation.]" (*Manriquez*, *supra*, at p. 581.)

Traditional self-defense exists when the defendant possessed both an actual and reasonable belief in the need to defend. (*People v. Stitely* (2005) 35 Cal.4th 514, 551 (*Stitely*); *People v. Barton* (2005) 12 Cal.4th 186, 199.) As with imperfect self-defense, the defendant must have an imminent fear of danger to life or great bodily injury. (*People v. Butler* (2009) 46 Cal.4th 847, 868; *Stitely*, *supra*, at p. 551.) Instructions on self-defense are not required absent supporting substantial evidence. (*Stitely*, *supra*, at p. 551.)

Having examined the record, we conclude there is no evidence, let alone substantial evidence, to support either theory of self-defense. The record shows that shortly after Orona and the three others in his van arrived at the strip mall, Nava exited the van and walked toward the marijuana dispensary. Defendant immediately confronted Nava, armed with a pistol, and commenced firing. There is simply no evidence defendant had an actual fear of imminent danger to his life or great bodily injury, as required for both forms of self-defense.

Defendant contends the videotape shows Nava approached defendant, a rival gang member, words were exchanged, and Nava reached into his pocket. This is inconsistent with the trial court's description of the videotape. We have examined all of the videotapes and agree with the trial court that the record does not support defendant's

8

description of events. Nava testified he did not speak to defendant, and no contrary testimony was offered by defendant. Moreover, even if some words were spoken, there is no evidence as to what purportedly was said, and mere speculation does not constitute substantial evidence.

Finally, we reject defendant's suggestion that his subjective belief in the need to defend what he perceived to be the territory of his gang created a basis for him to react violently and thereafter rely on either perfect or imperfect self-defense. Defendant argues, in part: "A rational jury could infer [defendant] thought an attack on his person was imminent since that is what rival gang members do, attack members of opposing gangs." The law, understandably, does not countenance mitigation of culpability for unprovoked acts of violence based on the purported norms of criminal street gangs.

### III

Defendant's final contention is the evidence is insufficient to support the finding that the crimes were committed for the benefit of a criminal street gang. The contention has no merit.

"The law regarding appellate review of claims challenging the sufficiency of the evidence in the context of gang enhancements is the same as that governing review of sufficiency claims generally. (See *People v. Vy* (2004) 122 Cal.App.4th 1209, 1224.)" (*People v. Leon* (2008) 161 Cal.App.4th 149, 161.) "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*Ibid.*) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled

9

with a contrary finding.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'  (*Ibid.*)" (*Albillar, supra,* 51 Cal.4th at pp. 59-60.)

"It has long been settled that expert testimony regarding whether a crime was gang related is admissible.  ([*Albillar*]*, supra,* 51 Cal.4th at p. 63; *People v. Gardeley* [(1996)] 14 Cal.4th [605,] 619.)"  (*People v. Vang* (2011) 52 Cal.4th 1038, 1050, fn. 5 (*Vang*).) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement.  ([*Albillar*]*, supra,* 51 Cal.4th at p. 63.)"  (*Vang*, *supra*, at p. 1048.) "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22[, subdivision] (b)(1).  (See, e.g., *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert opinion that the murder of a nongang member benefited the gang because 'violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, "fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang"']; *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [relying on expert opinion that 'a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang'].)"  (*Albillar*, *supra*, at p. 63.)

As explained in part I of this opinion, Officer Leyva expressed the opinion crimes such as defendant's were committed for the benefit of a criminal street gang because they instill fear in the community and in the rival gang members.  Citizens will be less likely to call the police, testify, or identify gang members due to the intimidation flowing from the gang's violent acts.  This facilitates the commission of future crimes by the gang. This type of violent conduct promotes the notoriety of the gang, and it serves as a lesson to rival gang members that if they enter territory claimed by Metro 13, there will be

retaliation in the form of a shooting. Officer Leyva's opinion easily satisfies the substantial evidence standard of review.

## DISPOSITION

The judgment is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

MINK, J.[*]

---

[*] Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.