Filed 12/1/15  P. v. Pena CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN ERIC PENA,<br><br>    Defendant and Appellant. | G049885<br><br>(Super. Ct. No. 10NF0523)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on November 12, 2015, be modified in the following particulars:

On page 1, first paragraph, the second sentence is modified to read in full:

Affirmed in part, reversed in part, and remanded for resentencing.

On page 17, first paragraph, the first sentence is modified to read in full:

We reverse Pena's street terrorism conviction and the jury's true finding on the street terrorism enhancement and remand the matter for resentencing.

This modification does not effect a change in judgment.

The petition for rehearing is DENIED.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G049885 |
|      v. | (Super. Ct. No. 10NF0523) |
| JUAN ERIC PENA, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Reversed in part and affirmed in part.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Eric Pena appeals from a judgment after a jury convicted him of attempted murder and street terrorism and found true numerous enhancements, including that he committed the attempted murder for the benefit of a criminal street gang. Pena argues the following: (1) insufficient evidence supports his conviction for street terrorism and the jury's finding on the street terrorism enhancement; (2) the trial court erred in admitting gang expert testimony in violation of his Sixth Amendment confrontation rights; and (3) the court erred in sentencing him on the gang enhancement. As we explain below, we agree with his first claim, disagree with his second claim, and need not address his third claim. We reverse his street terrorism conviction and the jury's finding on the street terrorism enhancement. In all other respects, the judgment is affirmed.

FACTS

*The Covered Wagon Motel*

On February 8, 2010, Thomas Coffman was staying the night at the Covered Wagon Motel (the Motel) with his friend, Alexis Uribe, who was living there with family. That night, Coffman and Uribe were riding their bikes when a man, later identified as Pablo Hernandez (Pablo), approached them with a gun and asked if they knew someone named "Smalls." The two rode their bikes across the street to the Motel and ran upstairs to Uribe's room.

Coffman and Uribe went downstairs and saw Pablo with another man who wore a hat; both had guns. The man in the hat asked where they were from and if they claimed any gang. Coffman and Uribe responded they were from nowhere and did not claim anything. The two men said they were from Varrio Sureno Insane (VSI) and were looking for "baby dicks," a derogatory term for South Side Brown Demons (SSBD) gang members. Pablo said they were looking for Smalls, a member of SSBD, and were planning to "execute him." At some point, Pablo realized that neither Coffman nor Uribe were Smalls, so he and his companion ran to their car and drove off. There were six or

2

seven people in the car and some of them flashed guns as they drove away.  As the men were leaving, Coffman turned and saw Smalls jumping over a wall next to the Motel.  Smalls was later identified to be Brian Camacho, a self-admitted and documented member of SSBD.

*The Lions Club*

Six days later, on February 14, 2010, Felipe Sanchez (Felipe) went to the Lions Club (the Club) around 8:00 or 9:00 p.m.  While he was outside, Pablo and his sister, Irene Hernandez (Irene), approached him.  Irene asked why he was looking at her and if he wanted any trouble with her brother Pablo.  Pablo threatened him and said he was from an Anaheim gang.  Pablo asked Felipe if he was from a gang, which Felipe denied.  Felipe told Pablo and Irene that he did not want any trouble.  He spoke with Pablo and Irene for about five or 10 minutes until they walked away.  Pablo called Pena, who arrived at the party and spoke with Pablo.

Miguel Sanchez (Miguel) went to the Club with his sister and brother-in-law.  When they arrived, Miguel saw Felipe, who he knew from high school in Mexico, outside arguing with someone he knew as Pablo and Pablo's sister, but he could not hear what was said.  The argument lasted for about three to four minutes and ended when Pablo and Irene walked away.

After the argument ended, Miguel went to speak with Felipe.  Felipe did not feel safe outside the Club, so he and Miguel crossed the street to speak with other friends about going somewhere else.  Before they were able to reach their friends on the other side of the street, someone shouted at them in English.  Felipe looked back and saw the man standing approximately six feet away.  When Miguel turned around, the man had a gun pointed at him and the man started shooting.  The shooter fired about six shots and fled.

3

Miguel had been shot once in the back and once in the side. Miguel's brother-in-law and sister took him to the hospital, and Miguel called 911.

About 30 minutes later, Pablo and Irene left the scene and were picked up by Pena. While in the car, Pena asked several times if he, Pena, had shot anybody. He then sent Irene and his then girlfriend to check the scene, but the police closed the street.

*Dale Street Apartments*

The next day, on February 15, 2010, around 9:30 p.m., Aaron Guardado was inside a restaurant and saw Pena outside trying to lure him into the parking lot. Guardado is a self-admitted and documented member of SSBD and goes by the gang moniker "Creeper." Pena flashed a handgun, and after Guardado refused to go outside, he left. In the early morning hours of February 16, 2010, the Pena residence was shot at, but no one was apprehended.

Estela Hernandez (Estela), Guardado's mother, lived at the Dale Apartments in February 2010. She rented rooms in her apartment to make extra money. In early February 2010, Pena contacted her about renting a room. About two and a half weeks later on February 16, 2010, she saw Pena on the street and he asked if the room was available. She took him to her apartment so she could give him her new phone number. Her son was sleeping on the sofa in the living room at the time. Estela and Pena went into the kitchen and Pena asked if the person sleeping on the couch was her son, which she confirmed. Pena made a telephone call and spoke with someone in English, and she could only understand him saying, "Yeah, I know this guy." Pena told her that he was leaving, walked into the living room, shot at the sofa that Guardado was sleeping on and left the apartment. Guardado was not wounded; he pulled the bullet out of the sofa and left. By the time the police arrived, her son was no longer at the apartment.

*Trial Court Proceedings*

A second amended information charged Pena with the following: conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1)), all further statutory

4

references are to the Pen. Code, unless otherwise indicated) (count 1); assault with a firearm against Coffman (§ 245, subd. (a)(2)) (count 2); assault with a firearm against Uribe (§ 245, subd. (a)(2)) (count 3); attempted murder of Miguel (§§ 664, subd. (a), 187, subd. (a)) (count 4); attempted murder of Felipe (§§ 664, subd. (a), 187, subd. (a)) (count 5); attempted murder of Guardado (§§ 664, subd. (a), 187, subd. (a)) (count 6); and street terrorism (§ 186.22, subd. (a)(1)) (count 7). The information alleged the following enhancements: street terrorism (§ 186.22, subd. (b)(1)), as to counts 1 through 6; personal discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)), as to count 4; personal discharge of a firearm (§ 12022.53, subd. (c)), as to counts 5 and 6; personal use of a firearm (§ 12022.5, subd. (a)), as to counts 1 through 6; and vicarious use of a firearm by a gang member (§ 12022.53, subds. (b), (e)(1)), as to counts 1, 2, and 3. On the prosecutor's motion, the court dismissed count 1.

At trial, the prosecutor offered the testimony of lead investigator and gang expert Detective Mike Brown. After detailing his background, training, and experience, Brown testified concerning the culture and habits of traditional turf oriented Hispanic street gangs. Brown explained how gang members commit violent acts to earn respect and listed the violent crimes gang members do to earn respect. He also explained how gang members "hit up" people to learn if the person is a gang member. He discussed how gang members must back up other gang members to maintain respect in the gang. Brown testified he first learned of VSI when he began "investigating a rash of crimes" in February 2010.

Over defense counsel's objection on Sixth Amendment grounds, Brown testified about VSI based on statements made by Pena's brother, Gilberto Pena (Gilberto), and Pablo. During one contact, Gilberto was heard yelling, "Fuck BD [Brown Demons], VSI for life." During a February 20, 2010, interview, Gilberto admitted to Brown that he was a member of VSI and went by the moniker "Payaso." Gilberto admitted he was shot in the head in 2009 by someone he believed to be a SSBD gang

5

member. Gilberto also provided Brown with a history of the gang, information on their rivals, and membership. Additionally, during an interview with Pablo, Pablo admitted to Brown that he was a member of VSI. Pablo provided Brown with a history of VSI, his gang moniker "Troubles," details on membership, and information about gang indicia officers found when they searched his house. Pablo admitted to committing crimes on behalf of VSI because they were disrespected by SSBD, but Brown did not specify what those crimes were. During Brown's investigation of VSI, he did not come across any STEP notices or field information cards for Pena, Gilberto, or Pablo.

Brown was present at the Pena residence when officers executed a search warrant after the offenses. In the residence, Brown found a sheet of paper with VSI graffiti as well as a sheet with a roster that listed eight gang member's monikers, which included the monikers of Gilberto and Pablo.

Brown testified concerning VSI as follows: VSI formed in 2006; in 2009 and 2010, VSI claimed the area of Ball and Euclid in Anaheim, which was also claimed by rival gang SSBD; VSI would identify itself by writing "VXI," "VSI," or "XXI"; in 2009, there was VSI graffiti found in the area of Ball and Euclid and some of the VSI graffiti was crossed out with SSBD graffiti, which is a sign of disrespect to VSI. Brown opined that in February 2010, VSI was an ongoing, organized criminal street gang with between five and 12 members. During the prosecutor's attempt to establish VSI was a criminal street gang, the following colloquy occurred:

"[Prosecutor]: And as of February of 2010, specifically February 8 through February 16, what were the primary activities of VSI?

"[Brown]: I would say aggravated assault, attempted murder, and felony weapon possession.

"[Prosecutor]: And when you say aggravated assault, you mean under . . . section 245 felony?

"[Brown]: That's correct.

6

"[Prosecutor]: And would that also include assaults with firearms?

"[Brown]: Yes, ma'am.

"[Prosecutor]: And the last thing you talked about was a pattern of criminal gang activity. Are you relying on the three instances here as your pattern of criminal activity?

"[Brown]: That's correct."

Later, on cross-examination, Brown stated his opinion for VSI's primary activities was based in part on his training and experience in regards to the "general rubrics and paradigms of traditional territorial Hispanic street gangs."

Based on his investigation, Brown opined Pena was a member of VSI and was an active participant of VSI at the time of the offenses here. Pena committed crimes with Pablo and Gilberto, documented and self-admitted members of VSI. In Brown's training and experience, gang members usually do not commit crimes with non-gang members. The prosecution did not ask Brown any hypothetical questions.

An Orange County Crime Lab forensic scientist testified a bullet was recovered from a truck parked at the Club. Sergeant Christopher Masilon testified Guardado gave him a cup wrapped in tissue containing a fired bullet and told him it was the bullet he had taken from the sofa. Shortly after the apartment shooting, Detective Kelly Phillips stopped a Dodge Durango driven by Gilberto and Pablo. After searching the vehicle, Phillips found a fully loaded .38 caliber revolver hidden in the dashboard.

An Orange County Crime Lab forensic scientist analyzed the .38 caliber revolver and determined it was functioning properly. A comparison was done between the test bullets that were fired from this gun at the crime lab and the bullet that was removed from the truck at the Club and, while there were similarities, the results were inconclusive. A second comparison was done between the test bullet and the bullet that was recovered from the sofa, which showed the bullets were fired from the same gun.

7

Pena testified VSI is not a gang. His motivations for his actions in February 2010 were not gang related. Before he and his wife met, four men raped her. He learned Camacho and Guardado were two of the four men.

On February 8, 2010, Pena left his house with Gilberto, Pablo, and two of his brother's friends. They went to a restaurant, where they saw Camacho riding his bike. He wanted to confront Camacho and talk with him about raping his wife, not to kill him or hurt him. Later, while they were driving around, Pablo got out of the car because they saw people on bikes, one of whom he thought was Camacho. They parked at the Motel, and he got out of the car. He and Pablo confronted two men on bikes and asked if they were Camacho, which they denied. At some point, he heard Pablo claim to be a member of VSI and ask the two men if they were from a gang. Once he realized that neither of the men were Camacho, he apologized and got back into the car and they drove away, but he was so upset about Pablo claiming VSI, he got out of the car. While he was walking, he saw police officers and jumped over a fence to get away because he was on parole. Neither he nor anyone he was with had a gun that night.

Pena testified that on February 14, 2010, he got a telephone call from Pablo asking him to come to the Club because someone had sexually assaulted Irene. Before leaving, he grabbed a gun from the house and took it with him for protection. When he got to the Club, Irene pointed out Miguel as the man that was bothering her. After watching Miguel for a while, he saw Miguel had a gun in his waistband. Before Miguel had a chance to reach for the gun, Pena fired his gun. He fired three shots to warn Miguel, but was never trying to kill him; he was trying to protect Pablo from being hurt by Miguel. He shot Miguel out of fear for Pablo, not to further or assist any gang. After the shooting, he gave the gun to Pablo and told his wife and Irene to go back to the scene to check for video surveillance.

8

The following night, Pena saw Guardado at a restaurant and confronted him about raping Pena's wife. Guardado denied having anything to do with the rape so Pena left. At around 2:00 the next morning, his house was shot at.

Pena testified that on February 16, 2010, he realized it must have been Guardado that shot at his house. He picked up his gun from Pablo and went back to the restaurant to look for Guardado. While walking down the street, he saw a woman that he was trying to rent a room from, but did not know she was Guardado's mother. He would frequently rent rooms after he spent time in drug court to get away from his house. When he got to the woman's apartment, he saw Guardado, confronted him about shooting the house, and fired his gun accidentally.

The jury convicted Pena of counts 4 and 7, but acquitted him of counts 2, 3, and 6. The jury found true all the enhancements. The jury was unable to reach a verdict on count 5.

The trial court sentenced Pena to 40 years to life in prison: 15 years to life for count 4 because of the gang enhancement; and 25 years for the personal discharge of a firearm causing great bodily injury enhancement. The court stayed sentencing on count 7 pursuant to section 654 and struck the sentencing for the gang enhancement.

DISCUSSION

I. *Sufficiency of the Evidence*

Pena argues insufficient evidence supports his conviction for street terrorism and the jury's finding on the street terrorism enhancement. He contends there was no evidence of the following: (1) VSI was a criminal street gang; (2) he knew VSI gang members engaged in a pattern of criminal gang activity or that he willfully promoted, furthered, or assisted felonious criminal conduct by VSI gang members; and (3) he committed a felony for the benefit of and with the specific intent to promote VSI. Because we conclude insufficient evidence supports the finding VSI was a criminal street gang, we need not address Pena's other contentions.

9

The street terrorism substantive offense, section 186.22, subdivision (a), states: "Any person who actively participates in any *criminal street gang* with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . in the state prison for 16 months, or two or three years." (Italics added.) The street terrorism enhancement, section 186.22, subdivision (b)(1), provides: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any *criminal street gang*, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . ." by an additional term. (Italics added.) Thus, both subdivisions (a) and (b) of section 186.22 require the existence of a criminal street gang.

Section 186.22, subdivision (f), defines a "'criminal street gang'" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Italics added.)

"'Therefore, the "criminal street gang" component of a gang enhancement requires proof of three essential elements: (1) that there be an "ongoing" association involving three or more participants, having a "common name or common identifying sign or symbol"; (2) that the group has as one of its "primary activities" the commission of one or more specified crimes; and (3) the group's members either separately or as a group "have engaged in a pattern of criminal gang activity." [Citation.]' (*People v. Vy*

10

(2004) 122 Cal.App.4th 1209, 1222 . . . . [(*Vy*)])" (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610-611 (*Alexander*).)

In *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323, the California Supreme Court held "primary activities" includes acts committed at the time of the charged offenses as well as prior conduct. The court explained the following: "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Ibid.*) The court stated, "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) The court also stated expert testimony may establish the primary activities. (*Ibid.*) On this latter point, the *Sengpadychith* court relied on *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), in which the gang expert testified as to the gang's primary activities and explained he based his opinion on conversations he had with defendant, who had been in the gang for nine years, and other gang members, hundreds of personal gang investigations, and information from his own police department and other law enforcement agencies. (*Sengpadychith, supra,* 26 Cal.4th at p. 324.) A few cases illustrate what has been, and has not been, held to establish a gang's primary activities after *Sengpadychith*.

In *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 (*Duran*), the gang expert testified, "based in part upon his personal experience in the field gathering gang intelligence, contacting gang members, and investigating gang-related crimes." The expert testified as to the gang's primary activities, as follows: "'The main one is putting fear into the community. [¶] Now, when I say that, what I mean is often these gang members are committing robberies, assault with deadly weapons, narcotics sales, and they're doing it as a group. [¶] And in doing so, they start claiming certain territories

11

within the city . . . . [¶] And they're controlling either the narcotics sales in that area, they're committing the robberies in this area, all for the purpose of fear and intimidation of the community.'" (*Ibid,* italics omitted.)  Citing to *Sengpadychith,* the court concluded the expert's testimony was sufficient, noting the expert opined the gang committed the specified crimes often and not occassionally, and evidence of gang members' commission of robbery and narcotics offenses corroborated the expert's testimony. (*Ibid*.)

In *People v. Perez* (2004) 118 Cal.App.4th 151, 160 (*Perez*), the gang expert attempted to establish the shooting of an Asian teenager was done in retaliation for conduct by other Asian gang members, and therefore was committed for the benefit of defendant's Hispanic gang.  The expert testified the Hispanic gang had a long-standing rivalry with Asians and African-Americans, and six years earlier he had investigated the attempted murder of an Asian boy by that gang.  (*Id*. at p. 157.)  The expert also noted there had been shootings of Asian gang members and an Asian teenager a few days before the present crime, which were possibly committed by defendant's gang.  (*Id*. at pp. 156-158.)  Citing to *Sengpadychith*, the *Perez* court held that even if defendant's gang "was responsible for the shootings of Asians on February 16 and 18, as well as the shooting of [the attempted murder victim], such evidence of the retaliatory shootings of a few individuals over a period of less than a week, together with a beating six years earlier, was insufficient to establish that 'the group's members *consistently* and *repeatedly* have committed criminal activity listed in the gang statute.'  [Citation.]" (*Perez, supra,* 118 Cal.App.4th at p. 160.)

In *Vy, supra,* 122 Cal.App.4th at page 1219, the gang expert testified that assaults, assaults with weapons, and attempted murders were among the primary activities of the gang, which had only six members.  The expert relied on three offenses that occurred within three months of each other:  a stabbing by a gang member, another stabbing that resulted in a conviction of assault with a deadly weapon, and the instant

12

stabbing. (*Id.* at p. 1223.) After discussing *Sengpadychith, and* distinguishing *Perez*, the *Vy* court concluded, "[W]e find the existence of three violent felonies by a gang as small as [this one] over less than three months to be sufficient . . . ." (*Vy, supra,* 122 Cal.App.4th at pp. 1225-1226 & fn. 12.)

In *Alexander, supra,* 149 Cal.App.4th at pages 611-612, another panel of this court addressed the same issue. The gang expert testified he knew of past crimes committed by members of the gang, but he did not provide any further information as to the specifics of the crimes and did not explain where, when, or how he learned of the information concerning these crimes. On cross-examination, he admitted the majority of cases connected with the gang-involved graffiti, which is not one of the enumerated crimes in section 186.22, subdivision (e). (*Alexander, supra,* 149 Cal.App.4th at p. 612 & fn. 2.) This court found the gang expert's testimony lacked foundation and was conclusory, and could not be considered substantial evidence of the gang's primary activities because it was not "'reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*Id.* at p. 614.) The prosecution also offered evidence regarding two past criminal convictions of gang members from two years earlier. (*Id.* at pp. 612-613.) This court concluded evidence was insufficient to establish the primary activities, stating, "[w]ithout more, these two convictions do not provide substantial evidence that gang members had '*consistently and repeatedly* . . . committed criminal activity listed in the gang statute.' [Citation.]" (*Id.* at p. 614.)

As to his contention VSI was not a criminal street gang, Pena argues there was insufficient evidence VSI's "primary activities" established a "pattern of criminal gang activity" because the February 2010 crimes were merely occasional offenses and Brown's testimony was without the required foundational support and was conclusory. Relying on Brown's expert testimony and Pablo's statements concerning committing crimes on VSI's behalf, the Attorney General asserts there was sufficient evidence of

13

VSI's primary activities. We agree with Pena as we conclude the facts here are more similar to *Perez* and *Alexander* than they are to *Duran* and *Vy*.

As we explain above, the term "primary activities" implies the members of the alleged gang "consistently and repeatedly" committed the criminal activity. The criminal activity must be the gang's chief occupation, which necessarily excludes the occasional commission of the criminal activity. Brown testified VSI formed in 2006 and he first learned of VSI in February 2010, when he began investigating the crimes at issue here. Evidence VSI gang members committed two assaults with a deadly weapon and three attempted murders on three occasions over the course of nine days in February 2010 cannot reasonably support the conclusion they were VSI's primary activities. (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1207 [§ 186.22 does not require proof of convictions]; see § 186.22, subd. (e).) Like in *Perez*—where a gang committed several shootings within a period of less than a week and a beating six years earlier—and *Alexander*—where there were two convictions two years earlier—here there were five felonies on three occasions over the course of nine days. These facts are unlike *Duran* where the gang engaged in narcotics sales and committed robberies often enough to gain control of an area. We recognize that in *Vy* the court found sufficient evidence of primary activities where the gang committed three violent felonies, fewer than were committed here. But that was over the course of three months. Here, the five crimes occurred on three occasions in a little more than a week. We conclude this is more akin to "occasional" criminal activity than it is to "consistent and repeated" criminal activity.

Relying on *Sengpadychith* and *Gardeley*, the Attorney General asserts Brown's testimony, which was based in part on his conversations with Pablo, provided sufficient evidence of VSI's primary activities. We have discussed both cases above, but a more detailed discussion of *Gardeley* is required.

14

In *Gardeley*, a police gang expert testified defendant had been a gang member for nine years, and the gang was primarily engaged in narcotics sales and witness intimidation, both statutorily enumerated felonies. (§ 186.22, subds. (e)(4) & (8).) The gang expert based his opinion on conversations he had with defendant and fellow gang members, and on "his personal investigations of hundreds of crimes committed by gang members," together with information from colleagues and other law enforcement agencies. (*Gardeley, supra*, 14 Cal.4th at p. 620.) The court noted the expert's testimony was admissible because it satisfied the "threshold requirement of reliability" and "provided much of the evidence necessary to establish that the . . . gang met . . . [the] definition [of] 'criminal street gang.'" (*Id.* at pp. 618-621.)

In *Gardeley,* there was ample documentary evidence of crimes committed by members of the gang in addition to the expert's testimony. The evidence included official court records showing defendant was convicted for being an accessory to a felony and possessing cocaine. Two police officers observed defendant and others flagging down cars in a manner associated with the sale of narcotics. Another gang member was convicted for shooting at an inhabited dwelling and making threats against a drug dealer. (*Gardeley, supra*, 14 Cal.4th at p. 613.) This evidence, in addition to the expert's testimony, reasonably supported the jury's finding there was a "criminal street gang" as defined in the statutory scheme.

Here, Brown's expert testimony was not sufficient to establish VSI's primary activities. Although Brown provided comprehensive testimony about his background, training, and experience concerning Hispanic criminal street gangs, like in *Alexander*, his testimony concerning VSI was without sufficient foundational support and was conclusory. Brown testified he first learned of VSI in February 2010 when he began investigating the crimes alleged here. When the prosecutor asked Brown, "And as of February of 2010, specifically February 8 through February 16, what were the primary activities of VSI? Brown answered, "I would say aggravated assault, attempted murder,

15

and felony weapon possession." The only other time Brown discussed primary activities was on cross-examination when he stated his opinions concerning VSI's primary activities was based on his training and experience in regards to the "general rubrics and paradigms of traditional territorial Hispanic street gangs." As we explain above, five offenses on three occasions over the course of nine days does not establish a gang's primary activities, and Brown's unsupported and conclusory opinion to that effect also is inadequate. Additionally, Pablo's statements to Brown do not provide the missing foundational support. Brown testified Pablo told him that he committed crimes on behalf of VSI because SSBD disrespected VSI. However, Brown did not testify as to what Pablo said those crimes were. Based on the record before us, we presume Pablo was referring to the offenses alleged here. But as we explain above, the five crimes here do not constitute consistent and repeated criminal activity.

Therefore, there was insufficient evidence establishing VSI's primary activities and thus that VSI was a criminal street gang. We reverse Pena's conviction for street terrorism and the true finding on the gang enhancement. Finally, our conclusion renders moot Pena's sentencing claim.

## II. Sixth Amendment

Pena contends Brown improperly testified regarding his conversations with Pablo and Gilberto in violation of his Sixth Amendment right to confrontation pursuant to *Crawford v. Washington* (2004) 541 U.S. 36. Pena acknowledges *Gardeley, supra,* 14 Cal.4th at page 619, held the basis for an expert's opinion is not subject to the hearsay rule because it is not admitted for the truth of any assertions, and that we are obligated to follow *Gardeley* pursuant to *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455. We note this issue is pending before the California Supreme Court (*People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681 and *People v. Archuleta* (Apr. 11, 2014, E049095), review granted June 11, 2014, S218640).

16

DISPOSITION

We reverse Pena's street terrorism conviction and the jury's finding on the street terrorism enhancement.  In all other respects, the judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.


17