Filed 5/4/21  P. v. Rodgers CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C080976 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F04912) |
| v. | |
| ELIJAH RODGERS, | |
| Defendant and Appellant. | |

Very early one morning in June 2013, Alvin Valentine, also known as Savon, died after being shot in the head while a passenger in a car passing by a house party.  An information charged defendant Elijah Rodgers with murder and shooting at an occupied vehicle.  (Pen. Code, §§ 187, subd. (a), 246.)[1]  The information also alleged defendant discharged a firearm, personally used a firearm, and the offense was committed for the

---

[1]  All further undesignated statutory references are to the Penal Code.

1

benefit of a criminal street gang. (§§ 12022.53, subd. (d), 12022.5, subd. (a), 186.22, subd. (b)(1).) A jury found defendant guilty on both counts. Sentenced to 82 years to life, defendant argues insufficient evidence supports the gang enhancement, ineffective assistance of counsel, and sentencing error. We remand for the court to exercise its discretion whether to strike defendant's firearm enhancement under section 12022.53. In all other respects, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On June 23, 2013, C.V. drove his brother, L.V., and cousins Savon and D.M to a party in Elk Grove. The group drove to a second party, but decided not to stop. As they drove away five to eight gun shots rang out. One bullet hit Savon, killing him.

An amended information charged defendant with murder and shooting at an occupied vehicle. The information further alleged as to both counts that defendant personally discharged a firearm causing the death of the victim, and the offense was committed for the benefit of a criminal street gang. It was also alleged as to count one that the defendant personally used a firearm. During the jury trial, the following evidence was introduced.

**The Shooting**

Several witnesses testified regarding the events leading up to and following the murder.

*C.V.'s Testimony*

C.V., L.V., Savon, and D.M. attended a party in Elk Grove late in the evening on June 23, 2013. The group left the party early the next morning en route to another party. At the second party, they stopped briefly so Savon, who sat in the passenger seat, could speak to a girl. The party was bigger than expected so the group decided to leave.

As they passed the house, C.V. heard five to eight gunshots come from outside the house where people had gathered. After he realized Savon had been hit he drove to the hospital.

C.V. testified twice. The first time he said he could not see the face of the shooter, although he had seen defendant in front of the house. He admitted telling police that he saw defendant shooting at them. He did so because he felt pressure from his family to identify someone. He named defendant because he was the only familiar face. He admitted to being worried that defendant would have someone retaliate against him if he testified.

Prior to his testimony C.V. had told detectives he saw defendant's face clearly; defendant was on the sidewalk and C.V. heard glass breaking. He believed defendant's name was "CNG" or "Top Rank." C.V. also identified defendant in a photo lineup. He told police he recognized defendant from the night of the shooting, not from his Facebook photo.

After his testimony, he contacted the prosecution and asked to testify again in order to clarify the events surrounding the shooting. He stated defendant shot at them the night of the murder. He was not truthful in his earlier testimony because he felt threatened and was afraid of being called a "snitch." Between his first and second testimonies, no one either threatened him or encouraged him to testify.

C.V. was "100 percent" certain defendant shot at the car. He was telling the truth and returned to testify because he knew who shot Savon. That night he could see defendant's face because of the streetlight. When C.V. first saw defendant he did not have a gun. C.V. drove down the street and turned around; defendant stood in the same spot. He had never met defendant, but had seen his photo on social media.

The night of the shooting he told officers he did not know who fired at them, but he was not telling the truth. He later told a detective he did not want to testify, but would tell him what happened. Although he feared retaliation, he told the truth for his cousin, because defendant had shot his cousin.

3

### *Testimony of Other Party Goers*

C.V.'s brother, L.V., heard more than five gunshots; some struck the car as his brother drove away. Savon had been hit and they drove to the hospital. L.V. did remember being shown defendant's picture, but he did not recall his brother telling him that defendant was the shooter.

T.S. went to both parties. At the second party she "had a bad feeling" and stayed by the back door. She heard gunshots and fled. She told detectives she thought some people had guns and that some of them were gang members because they arrived in big groups. She also told detectives she thought there were gang members at the earlier party.

In the group with T.S. was N.W. She heard gunshots coming from outside the house. They stopped and then started up again.

S.W. accompanied the group at the party. She heard gunshots she believed were coming from the front of the house. She jumped the fence in the backyard as the gunfire continued. Although she saw several cars drive away, she was not wearing her glasses. She could not remember telling officers that one car was grey and one was black. She thought people were yelling in one car, but she did not recall telling officers they were "repping their hood," which she thinks of as "throwing up their, gang throwing up their hood."

S.J. attended the party with friends. A group of five or six men walked in and S.J. spoke to one of the group named Oscar. Defendant was with Oscar, but she did not see a gun in his hand. The group left, returned, and left the party again. S.J. then heard gunshots and saw a male with dreadlocks wearing a black sweater by the front door with a gun. Oscar had been wearing a black sweater and she thought he had dreadlocks.

At one point, Oscar made a hand gesture that had to do with either guns or stars. S.J. told detectives Oscar said some numbers, 6100 or 5200 and he was doing "gang

stuff." The police showed her pictures of Oscar and defendant. After the shooting and before talking to the police someone showed her a picture of Oscar.

B.M. was in the same group as S.J. She knew Oscar, but had not seen him in some time and did not know if he was in a gang. Defendant was with Oscar that night and Oscar was acting a little out of the ordinary. At one point, Oscar and defendant went outside. A few minutes later B.M heard gunshots. Oscar came back inside shooting and then went into the backyard.

B.M ran outside and saw two people in the street shooting. She saw the person closest to her "a little bit," but it was dark. She told police it was defendant and the other person shooting was Oscar. Oscar fired at her three times. Defendant was also shooting, but she did not know in what direction. B.M. and her friends fled, but stayed in the area. She saw Oscar in the window of what looked like a Pontiac, yelling and holding a gun. Oscar yelled "51 something." She could not see who was driving.

When she later spoke with police she identified Oscar in a photograph and stated she might be able to identify the other shooter. A friend had shown her a picture of defendant and said that was who shot the victim, but she was not sure. Although B.M. later identified defendant in a photographic lineup, she said she was not 100 percent certain. She thought she told a detective defendant was at the party, but was not certain he was in the street shooting. She told police she was 64 percent certain of her identification and felt the same way at trial.

H.Z. attended both parties. When she pulled up to the second party, B.M. told her to go because there was a shooting. H.Z. subsequently heard three gunshots. Police contacted her, but she did not recall telling them she saw someone come from behind B.M. and start shooting in her direction. H.Z. denied telling a detective that it was an African-American male in a hooded sweatshirt, and that he said something just before he started shooting. She denied telling the detective the person yelled "Starz." H.Z. was familiar with "Starz," describing it as a "group of dudes, some girls probably." She has

5

heard it used to describe a gang. At trial, she stated she did not hear anyone say "Starz" before the shooting started. A detective asked H.Z. if defendant was the person shooting and she said she did not know. Prior to the night of the shooting, she had only seen defendant once.

*Neighbors*

K.W. lived in the neighborhood near the second party. The night of the shooting, as she arrived home, she saw a burgundy car driving fast down the street. When she turned the corner she saw someone who appeared to be pointing a gun, but she did not see the gun. She briefly saw a young African-American male. When she pulled into her garage, she heard gunshots. She told detectives three African-American males were walking down her driveway.

K.W.'s sister accompanied her. In the middle of the block, K.W.'s sister. saw a young man who was wearing a hooded sweatshirt or had dreadlocks crouched down, and she saw three flashes. The person appeared to be aiming at their car or over their car, but they were not hit. As they pulled into the driveway, she saw three men coming from the side of her sister's house. After the garage closed they heard more gunfire.

**Aftermath**

Following the shooting, an officer took pictures of shell casings. A detective examined C.V.'s car and found both windows on the driver's side were broken and there were bullet holes in both doors. Two bullets and a copper jacketing were recovered.

J.R. helped C.V.'s father clean C.V.'s car. The driver's side was shot up and the passenger seat was bloody. He found a bullet under the passenger seat. Police collected the bullet and had the car towed.

A forensic investigator examined the car to determine the trajectory of the bullets. The driver's door had bullet holes and the glass was shattered. There did not appear to be any bullet holes on the passenger side.

6

An autopsy revealed Savon suffered a gunshot wound. The bullet entered the left side of his head and exited the right. From the wound the examiner determined the gun was fired from more than about four feet away, or there was something in between the gun and the victim, like a window or a door.

A criminalist examined the nine-millimeter cartridge casings and one 40-caliber cartridge case. The nine-millimeter casings came from at least two different guns. The criminalist also examined three bullets and one bullet jacket. He compared the bullets to the nine-millimeter gun in defendant's possession when he was arrested, but the gun did not fire any of them.

A detective met with S.J. who told him that at the party she spoke with someone named Ozzie wearing a black sweater or hoodie with a rest in peace logo on it. Ozzie made a guns down motion with his hands and she saw him with a gun near the party. She also said there was another gun and she had information about another person shooting. However, people would be reluctant to help the police because of the gang involvement.

**Surveillance Footage**

A police detective discovered one of the houses near the shooting had multiple surveillance cameras covering different angles. The jury saw the footage.

The footage revealed cars arriving and parking. A group of people got out of one car and went over to another. The front passenger of one of the vehicles got out of the car and opened the hood.

A different angle showed the victim's vehicle. Another angle showed three people running up to a car with one person trying to do something near the hood and then running away. In later footage, the same three people returned to the car. One opens the hood, closes the hood, and then all three get in the car. The car pulls away without turning on its headlights. The car is missing its front passenger side hubcap. The rear window begins to roll down. In the footage is another vehicle, a white Buick with an individual sitting on the window sill of the front passenger side.

**Defendant's Vehicle**

A detective examined defendant's Ford Tempo, which had been impounded. The vehicle was missing the front passenger side hubcap. In order to operate the fan it was necessary to connect it directly to the battery, which could be done quickly. If the wires were left connected when the car stopped the fan continued to run, draining the battery. An officer who had contact with defendant twice prior to the shooting noted that each time defendant had to do something under the hood.

**Interviews**

L.V. told a detective that he did not see who shot at them, but his brother had. They had seen a picture of defendant after the shooting. His brother told him that the picture of defendant was the person who shot Savon.

A detective interviewed defendant in July 2013. He said he had not been at the party and had never been at a party in that neighborhood. Defendant admitted he was in possession of a handgun when officers arrested him. He had the gun for about a month.

**Cell Phone Calls and Texts**

A detective with training in cell phone records obtained defendant's cell phone records from around the time of the shooting. The records revealed defendant received and made outgoing calls that went to a tower near Mack Road and Deer Meadow Drive.

The detective also located texts from defendant's cell phone. At around 5:00 a.m. a text uses the word "Mobb." A later text states, "not turnt Mobb. An unknown car sliding." A text at 3:22 a.m. says, "Hey, I wasn't there tonight." At 3:33 a.m. a text uses shorthand which the detective interpreted to mean,"tell everybody to say I wasn't there. They say I caught a body Mobb," and that the sender was cutting his "dreads."

A little later defendant's phone received the texts "Be safe, man" and "We just trying to make sure you good cousin, that's all." A few hours later a sent text states: "Wow, you going to hang up on me 'cuz you with a N on my life this important. I know you seen on Facebook people shot. I got hit and didn't go to the hospital yet." A text

sent a few minutes later states: "On my soul on Creek Mobb. I'm not lying. I need you on us." A text sent later that evening says: "Laying low."

A text sent a week after the shooting states: "Ain't no police. Are people looking for me." A few days later a text says "Fuck you on Stunna gang."

**Facebook**

The detective also reviewed defendant's Facebook records. Defendant's Facebook profile name is "CMG Top Rank E." An entry for an event at the end of June was for the victim. An entry from July 17 states: "CMG Top Rank E box on top of boxes I got ammo WTF is you saying hoe." Other entries refer to "TUG" and "Guttah Gas Team." Many entries make references to guns. An entry from June states: "Man I love my team. I'll die for my Ns dawg TUG slash GGT."

**Gang Expert Testimony**

Detective Joseph Ellis specializes in African-American gangs in South Sacramento. He is familiar with gang activities, lifestyle, philosophies, memberships, dress and hairstyles, graffiti, rivalries, and subsets. A subset is a pop-up beneath the main gang. Someone can be a member of both.

Ellis is familiar with the G-Mobb, Guttah Boyz, and Starz gangs. Guttah Boyz and Starz are both subsets of G-Mobb. He provided a history of the gangs. Some members of G-Mobb wanted only people from Oakland to be members, so people from Sacramento used another name which gradually became Starz. Eventually, a group of Starz members began calling themselves Guttah Boyz. They became a violent gang and a series of shootings broke out with rival gangs Oak Park and FAB.

G-Mobb members do not identify with a particular color of clothing, but many members have thick dreadlocks. Starz members have star tattoos or stars on their clothing. Guttah Boyz use the Gucci symbol, which has two "G's."

Gang members strive for respect, which raises your stature within the gang. Disrespect towards a member leads to retaliation through fear and intimidation.

9

A gang member committing crimes benefits the gang in a variety of ways. Younger members break into houses giving older members their loot as a sign of respect. As members progress into shootings and assaults it increases the gang's status in the community. When gang members commit a crime they say the gang name or words associated with the gang to enhance the gang's reputation. Carrying a gun increases your reputation with the gang. If tensions between gangs rise and a rival gang member is found alone, gang members are expected to do something about it.

In late 2007, early 2008 a group of Starz members had a disagreement with the gang and formed their own group: Gunz Up. They aligned themselves with the Oak Park gang and were opponents of G-Mobb and Starz and their subsets. Numerous shooting followed and Gunz Up membership shrunk.

Ellis stated G-Mobb, Starz, and Guttah Boyz are all criminal street gangs within the meaning of section 186.22. Each has three or more members, sports a common sign or symbol, and has engaged in a pattern of criminal activity.

Ellis described a November 5, 2012 crime involving Devin White, a Guttah Boyz member. White was in a vehicle stopped by police. He ran from the car and threw a gun. Officers arrested him for possessing a gun. According to Ellis, the offense was committed to benefit the gang because members do not want to get caught slipping and want to maintain their reputations with the gang. Slipping means you were caught unarmed and could get shot or beat up. Also, with White was a gang member from a gang aligned with G-Mobb.

In an incident on March 17, 2010, members of Starz and Guttah Boyz confronted a Gunz Up gang member. Following an argument, the Gunz Up gang member was shot and killed. The shooting benefited both the Starz and Guttah Boyz gangs. According to Ellis, murdering a rival gang member is the ultimate "feather in your cap," and "you [are] pretty much immortalized whether you go to jail or not."

10

Ellis testified defendant is a member of the Guttah Boyz criminal street gang. Ellis, who had never met defendant, reviewed police reports, cell phone records and pictures, and pictures from Facebook. Defendant has a tattoo with a Scrooge McDuck head and a small "g." The tattoo could refer to G-Parkway, G-Mobb, or Guttah. Defendant had 11 contacts in which he was with nine different gang members. Ellis also described photos of defendant in the company of other gang members and flashing gang signs. Photos on defendant's Facebook page also showed defendant making gang signs. In a YouTube video defendant danced around with a weapon making derogatory remarks about a rival gang. In addition, the fact defendant was armed when he was arrested was another factor in Ellis's opinion that defendant is a gang member. Ellis reviewed the texts from defendant's phone and testified they referred to being shot at by rival gang members and committing crimes for the gang.

Ellis also testified that when members of a gang commit a drive-by shooting at a house party and yell terms associated with the gang, it benefits the gang because it lets people know which gang is responsible for the shooting. When a gang member commits a crime and yells out the name of their gang, they are making sure everyone knows they are from a certain gang.

A correctional officer from the Sacramento main jail testified detectives asked him to monitor defendant. The officer checked defendant after a particular visit and found incriminating papers on him.

**Defense Case**

Defendant testified he went by himself to the first party driving his Ford Tempo. He stayed 30 minutes to an hour when friends told him about a second party. Defendant drove to the second party with two passengers in a caravan of about 10 cars, one of which was a long black car. The surveillance video showed defendant's car and the black car. He did not know the people in the black car.

11

There were several large groups of people in front of the house. Defendant stood outside and talked to a girl he knew. Suddenly he heard gunshots and started running with everyone else. When his friends saw him running to his car they ran too. As they reached the car there were more gunshots, so they turned and ran into a court. After a few minutes they walked back to the car. The surveillance video showed him walking back to the car and one of his friends hooking up the car's fan. They drove down the street the party was on. As he drove, defendant heard "Taz" got shot.

Defendant stopped and Taz got in the car. He drove to the hospital and one of the passengers took Taz inside. Defendant dropped off his other passenger and drove to a friend's house, where he spent the night.

The next day defendant heard he was suspected to be the shooter. People called and texted and he saw things on Facebook. He deactivated his Facebook account, but then reactivated it.

Defendant did not shoot at C.V.'s car and did not have a disagreement with the victim. He had seen the brothers before, but did not know them. Defendant tried to find people to say he was not at the party to bolster his initial lie to the police.

Defendant was carrying a gun when police arrested him. He had the gun with him the night of the shooting but had not fired it that night. The nine millimeter he had at the party had been purchased about a month earlier.

When police questioned him, defendant told them he was not at the party. His reluctance to cooperate was based on his belief they would not believe him anyway. Defendant also told a reporter he was not there that night.

The night of the shooting he had no contact with Oscar, nor did he coordinate with him in the shooting. He had not met him before the shooting; he met him in jail.

Growing up, defendant knew people in Guttah Boyz from school, parties, and mutual friends. He had been around gang culture his whole life. He described himself as

12

a "close associate" of Guttah Boyz. However, he has never shot anyone or been shot at. Defendant admitted he was an associate, but not a member of the Guttah Boyz gang.

The summer of the shooting, defendant made money selling marijuana. Different women he knew gave him money and let him stay at their places.

Defendant stated that people taunted one another on Facebook. It is connected to rappers from different neighborhoods in Sacramento. The postings that suggested he wanted to shoot people were just rap lyrics. He was in the rap video because he was a friend of the main rapper. He was holding someone else's gun. Many of the people in the video are Guttah Boyz gang members.

Defendant did not remember an officer taking papers from him in jail. In one of the letters, defendant wrote to his brother: "I need you and Precious to confirm I'm innocent and I was with you. Ask slash tell [my sister] if she can vouch and say, yeah, I was over there with you." Defendant denied the letter was his. In another letter defendant disavowed, he asked one of his girlfriends to tell people to tell the district attorney they had misidentified defendant.

Dr. Martin Blinder is a psychiatrist recognized as an expert in forensic psychiatry and eyewitness identification. Blinder explained two classifications of memory, immediate and remote, stored in different parts of the brain. The immediate memory can hold only a limited number of items and is only good for 60 to 90 seconds unless it is moved to the remote memory. Eyewitnesses go through a three-step process: perception, storage or retention, and discharge or expression. All three are required to make an identification. If a person, under pressure to identify the person shown to them in a photograph as the shooter, was later shown the same person in a photographic lineup, there is a danger the witness's recollection was contaminated during the storage phase. In addition, a witness's relationship to the victim can impact the witness's identification.

13

**Verdict, Sentencing, and Motion for a New Trial**

The jury convicted defendant on both counts and found all the allegations true. Prior to sentencing, defendant obtained new counsel. New counsel filed a motion for a new trial alleging ineffective assistance of counsel. Following a hearing, the trial court denied the motion.

The court sentenced defendant to 25 years to life on the murder count, and an additional consecutive term of 25 years to life pursuant to section 12022.53, subdivision (d), the upper term of seven years on the count of shooting at an occupied vehicle, and an additional 25 years to life pursuant to section 12022.53, subdivision (d), all to be served consecutively. Defendant's sentence is 82 years to life. The court did not impose any time for the two gang enhancements.

Defendant filed a timely notice of appeal.

## DISCUSSION

## I

### Sufficiency of the Evidence to Support Criminal Street Gang Enhancement

Defendant argues insufficient evidence supports the jury's finding that both the murder and the shooting at an occupied vehicle were committed for the benefit of a criminal street gang. Defendant asserts there was insufficient evidence that "Guttah was an association whose primary activity was the commission of predicate crimes or that Guttah had engaged in a pattern of criminal activity."

**Background**

The jury found defendant committed both crimes for the benefit of a criminal street gang pursuant to section 186.22, subdivision (b)(1). However, the court did not impose any prison time for the two gang enhancement findings.

**Discussion**

Defendant disputes the sufficiency of the evidence in support of the jury's finding that Guttah Boyz's primary activity was the commission of the predicate crimes or had

14

engaged in a pattern of criminal activity. Defendant focuses on two prior gang crimes: a murder on March 17, 2010, and the arrest of a gang member for unlawful possession of a handgun on November 5, 2012. In a supplemental brief defendant argues, should we strike the unlawful possession, the murder which occurred on March 17, 2010, cannot be used to establish a pattern of gang activity because it and the current offense are more than three years apart.

In determining whether sufficient evidence supports a conviction or enhancement, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We examine the record to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—sufficient to convince a reasonable trier of fact that the defendant is guilty beyond a reasonable doubt. This standard also applies to a claim of insufficiency of the evidence to support a gang enhancement. (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224 (*Vy*).)

"[T]he 'criminal street gang' component of a gang enhancement requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' " (*Vy, supra*, 122 Cal.App.4th at p. 1222.)

The phrase "primary activities," as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's chief or principal occupations. The primary activities requirement can be met by proof of either prior conduct or acts committed at the time of the charged offense. Sufficient evidence can be evidence that gang members have consistently and repeatedly committed

15

criminal activity set forth in the gang statute.  Expert testimony can also establish such evidence.  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)

The trial court instructed the jury, in part:  "A criminal street gang is an ongoing organization, association, or group of three or more persons, whether formal or informal.

"1.  That has a common name or common identifying sign or symbol.

"2.  That has as one or more of its primary activities the commission of murder or unlawful possession of a firearm.

"And 3.  Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.

"In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.

"The pattern of criminal gang activity, as used here means,

"1.  The commission of any combination of two or more of the following crimes: Murder or unlawful possession of a firearm.

"2.  At least one of those crimes was committed after September 26th, 1988.

"3.  The most recent crime occurred within three years of one of the earlier crimes.

"And 4.  The crimes were committed on separate occasions or were personally committed by two or more persons.

"If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved.

"You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed.  But you do not all have to agree on which crimes were committed."

Defendant focuses on three specific crimes the prosecution argued qualified as gang criminal activities: the arrest of gang member Devin White when he threw away a

16

gun at a traffic stop on November 5, 2012, the March 17, 2010 killing of a rival gang member at a bus stop, and the instant offense, which occurred on June 23, 2013. We consider each in turn.

In the November 5, 2012 incident White, a Guttah Boyz gang member, was in a vehicle stopped by police. White ran from the car and threw a gun and was subsequently arrested for possessing the gun. Defendant argues there was no proof that White had been previously convicted of a crime, an element of the enumerated offense relied upon by the prosecution, section 186.22, subdivision (e)(31).

However, under section 186.22, subdivision (e) a pattern of criminal activity requires the "commission of, attempted commission of . . . or conviction of" two or more qualifying offenses. Because section 186.22 contains both the options of "commission" or "conviction," the statute expressly does not require that the offense necessarily result in a conviction. (*In re I.M.* (2005) 125 Cal.App.4th 1195, 1207-1208; *In re Leland D.* (1990) 223 Cal.App.3d 251, 258.) In order for the jury to rely on the November 5, 2012 gang incident it did not have to find White was convicted of possession of a gun.[2]

Under section 186.22, subdivision (e), "the last of those offenses [relied upon by the jury] occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ." Here the prosecution presented both the 2012 arrest of a gang member for possession of a gun and two gang-related murders: the current offense and a murder in 2010. Defendant rests his challenge to the criminal street gang enhancements on insufficient evidence to support the arrest for

---

[2] Defendant relies on *People v. Garcia* (2014) 224 Cal.App.4th 519. In *Garcia*, the court found that a gang member enhancement could not be imposed on the basis of predicate crimes committed by the defendant himself when he was acquitted of those crimes. The jury was instructed that what was required was a "conviction," even though commission is sufficient under the law. (*Id.* at pp. 524-526.) That is not the situation before us in this present case.

17

gun possession. If the 2012 gun possession cannot provide the basis for a gang enhancement, the 2010 murder did not occur within three years prior to the current offense: "Rather, they occurred three years, three months and six days apart." Since we find sufficient evidence to support the jury's finding on the 2012 gang member's arrest, we reject defendant's challenge to the sufficiency of the evidence.

## II

### Motion for a New Trial—Ineffective Assistance of Counsel

According to defendant, the trial court erred in denying his defense counsel's motion for a new trial based on ineffective assistance of trial counsel. In the new trial motion, defendant argued trial counsel failed to investigate other party-going witnesses who would have testified defendant was not the shooter.

**Background**

Following the verdict, defendant retained new counsel. The new counsel filed a motion for a new trial claiming ineffective assistance of counsel.

Defense counsel stated at least 75 people attended the party in question, but no testimony by any partygoer was presented by the defense at trial to establish defendant was not the shooter. Counsel was aware of eight people who claimed to have seen defendant at the party and would testify defendant was not the shooter. Defendant signed a declaration stating he gave the names of various witnesses who were at the party, knew defendant, and would testify that he was not the shooter to defense counsel. Four individuals signed declarations to that effect and that they had not been contacted by defense counsel.

In opposing the motion, the prosecution argued defendant's declaration and the declarations of three individuals who had pre-existing relationships with defendant were not credible because the declarants had criminal histories or outstanding bench warrants. The information was also inconsistent with the evidence at trial. In support, the prosecution submitted rap sheets and investigative reports of three of the witnesses.

18

The trial court, following argument, held: "The problem . . . or the difficulty the Court is having with the argument is this:

"The fundamental standard is whether or not there's a reasonable probability of a different result.

"Now what we are looking at are alibi witnesses -- excuse me, we are looking at witnesses who are stating that, in fact, your client was there but he did not shoot a weapon.

"What the Court now needs to look at is whether or not those witnesses have a measure of credibility such that, in fact, their testimony before the jury would have potentially resulted in a different result or reasonably likely to result in a different result.

"I'm not finding that. The problem I am having here is I find that these witness' declarations are inherently incredible.

"When I look at the entire case, when I look at the alibi witnesses who weren't presented but whose discovery was provided, when I think about the testimony of the case, when I think about the way that . . . C.V. testified and how his story changed, when I think about the statements that your client made when he was on the witness stand and the statements he was making while in jail, I find those statements by these witnesses in the declarations to be inherently incredible.

"As a result, the Court is going to deny the motion."

**Discussion**

We review a trial court's denial of a new trial motion under the abuse of discretion standard. We defer to the trial court's finding of fact and will not disturb the court's conclusion absent a showing of clear and unmistakable abuse. (*People v. Wallin* (1981) 124 Cal.App.3d 479, 482-484.)

To establish ineffective assistance of counsel, a defendant must show counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance prejudiced the

19

defendant. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) We accord trial counsel's tactical decisions substantial deference and do not second-guess counsel's reasonable tactical decisions. (*People v. Maldonado* (2009) 172 Cal.App.4th 89, 97.)

When an ineffective assistance claim is based on a failure to investigate, the defendant must show more than a defense counsel's failure to interview or call available witnesses. (*People v. Knight* (1987) 194 Cal.App.3d 337, 345.) As the Supreme Court reasoned: "Although trial counsel clearly has a duty to adequately investigate possible defenses to enable formulation of an informed trial strategy [citation], we will not presume from a silent record that counsel failed in this duty." (*People v. Jennings* (1991) 53 Cal.3d 334, 375.)

In addition, we review the trial court's decision on the admissibility of evidence under the abuse of discretion standard. We reverse only if the court acted in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

According to defendant, his defense was that although he had been at the party, he was not the person who fired the shots. "However, former counsel presented no witnesses from the party to testify that [defendant] was not the shooter. As new counsel put it, there were over 100 people at the party; two identified defendant (one with substantial uncertainty); where were the other 98?" Defendant argues there was no rational tactical reason not to contact possible alibi witnesses "to see what they had to say and how credible they might be."

However, the trial court, whose discretion we defer to, considered the proposed alibi witnesses vis-à-vis defendant's own testimony and the statements he made in jail. The court also noted C.V.'s testimony and ultimately found the witnesses' statements in their declarations to be "inherently incredible." We find no abuse of discretion.

First, defendant undermined his own credibility concerning his whereabouts the night of the murder. Defendant texted the night of the party denying he was at the party

20

or telling people to say he was not there. He told police he was not at the party, but admitted at trial he was. Defendant also told a reporter he was not at the party. While in jail, defendant encouraged others to lie on his behalf and state he was not at the party. Defendant's brother and others told a defense investigator that defendant was at a family function the night of the shooting.

Defendant brushes aside this evidence, contending "all of these occurred very early in the case and were an initial knee-jerk reaction to avoid being involved in the trouble all the party attendees would have been aware of. Those early denials do not absolutely defeat the credibility of [defendant's] declaration about what he told former counsel, once the defenses of fact began to be investigated and discussed." We disagree. The trial court quite rightly took these contradictions into account in determining whether defense counsel was negligent in failing to follow up on the witnesses defendant sought to present.

In addition, we find the trial court's conclusion that the witness declarations were "inherently incredible" to be neither arbitrary nor patently absurd. The prosecution addressed each declaration. We shall not review the backgrounds of the witnesses in detail, but we note that two of the witnesses had multiple criminal convictions, both individually and in conjunction with one another. Another witness was arrested with defendant's girlfriend and one witness was a Starz gang member in custody for a robbery and murder. Moreover, none of the witnesses stated they were with defendant during the entire course of the evening. Some of the witnesses' versions of events contradicted defendant's version of events.

The trial court also noted C.V.'s testimony in finding defense counsel did not perform ineffectively. C.V. testified he was 100 percent certain defendant fired the shots that killed Savon. Defendant admitted being armed on the night of the shooting. Given the evidence before it, the trial court did not err in denying defendant's motion for a new trial based on ineffective assistance of counsel.

21

# III

## Section 12022.53

In a supplemental brief, defendant requests that, in light of amended section 12022.53, we remand to the trial court to permit it to exercise its discretion to strike the firearm enhancements. Effective January 1, 2018, section 12022.53, subdivision (h) was amended to provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." Defendant contends the amendment should apply retroactively to all cases not final in which a firearm enhancement was imposed. The People agree.

Defendant was charged in count one with first degree murder (§ 187, subd. (a)), with the allegation he had intentionally and personally discharged a firearm causing death (§ 12022.53, subd. (d)), personally used a firearm (§ 12022.5, subd. (a)), and that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and in count two, with discharge of a firearm at an occupied motor vehicle (§ 246) with the same firearm and gang allegations as count one. The jury found defendant guilty on both counts and found all allegations true. The court sentenced defendant as to count one, 25 years to life as to the murder conviction, plus 25 years to life, consecutive, as to the section 12022.53 firearm enhancement, with no time imposed as to the section 12022.5, subdivision (a) firearm enhancement and as to count two, seven years on the shooting conviction, consecutive, plus 25 years to life as to the section 12022.53 firearm enhancement.[3]

---

[3] In his appeal, defendant points out, in the reporter's transcript the section 12022.5 enhancement states "12022.5(a)(1), no sentence imposed." A minute order also states no sentence was imposed. Finally, the abstract of judgment reflects a sentence of 25 years to

We agree with the parties that remand is appropriate. Both the language of the statute and the Supreme Court decision in *In re Estrada* (1965) 63 Cal.2d 740 support retroactive application. Under *Estrada*, although in general amendments to the Penal Code do not apply retroactively, courts recognize an exception for amendments that reduce the punishment for a specific crime. (*People v. Brown* (2012) 54 Cal.4th 314, 323-324; *People v. Francis* (1969) 71 Cal.2d 66, 75-76.) In addition, the amendment to section 12022.53, subdivision (h) states "[t]he authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."

In order to avoid remand, the record must clearly indicate the sentencing court would not have exercised its discretion to lessen the sentence. (*People v. Askey* (1996) 49 Cal.App.4th 381, 389; *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.) We find no such evidence in the record. We cannot deprive the court of its ability to exercise its discretion under the law. Therefore, remand is appropriate.

---

life for the section 12022.5, subdivision (d) enhancements, but in the column where the court is to indicate the sentence for the section 12022.5, subdivision (a) enhancement there is a "0." Defendant notes the abstract of judgment should be amended to reflect an "S" rather than a "0." The People agree. On remand the abstract of judgment should be amended to reflect an "S" rather than a "0."

## DISPOSITION

We remand to allow the trial court to exercise its discretion to strike defendant's firearm enhancements pursuant to section 12022.53 and to, if necessary, amend the abstract of judgment. The abstract of judgment should also be amended to reflect an "S" rather than a "0" for the section 12022.5, subdivision (a) enhancement and a certified copy forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed

/s/
RAYE, P. J.

We concur:

/s/
MAURO, J.

/s/
RENNER, J.

24